**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x :

FAHAD GHAFFAR

                        Plaintiff,

                -against-

JOHN PAULSON, PAULSON PRV HOLDINGS,
LLC, and J.P. MORGAN TRUST COMPANY OF
DELAWARE AS TRUSTEE OF THE PAULSON
2009 FAMILY TRUST,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x :

Case No: 3:23-cv-01455-CVR

<u>Oral Argument Requested</u>

# PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS JOHN PAULSON'S AND
### <u>PAULSON PRV HOLDINGS LLC'S MOTION TO DISMISS</u>

Harold D. Vicente-Colon (USDC-PR 211805)
Harold D. Vicente Gonzalez (USDC-PR 117711)
Vicente Law LLC
Capital Center Sur Ph1-1201
239 Arterial Hostos
Hato Rey
(787) 751-8000

Martin P. Russo (admitted *pro hac vice*)
Robert Sidorsky (admitted *pro hac vice*)
Daniel Branower (admitted *pro hac vice*)
RUSSO PLLC
350 Fifth Avenue, Suite 7230
New York, New York 10118
(212) 363-2000

José A. Andréu-Fuentes (USDC-PR 204409)
Alfredo M. Umpierre-Soler (USDC-PR 226205)
The Law Offices of José A. Andréu-Fuentes
261 Ave. Domenech
San Juan, PR 00918-3518
(787) 754.1777

*Attorneys for Plaintiff Fahad Ghaffar*

Dated:  November 9, 2023

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................... 1

ALLEGATIONS OF THE COMPLAINT ................................................................. 3

ARGUMENT………………………………………………………………………..4

   I.    THE APPLICABLE STANDARD ON A MOTION TO DISMISS PURSANT TO
       RULE 12(b)(6)............................................................................................... 4

   II.   THE AMENDED COMPLAINT SATISFIES EACH OF THE ELEMENTS FOR
       PLEADING A CLAIM FOR SECURITIES FRAUD PURSUANT TO SECTION 10(b)
       AND RULE 10b-5 ........................................................................................ 5

      A.  The Complaint Pleads a Material Misrepresentation ...................................... 5

      B.  The Amended Complaint Adequately Pleads Scienter...................................... 9

      C.  The Convertible Note Is a Security .............................................................. 12

      D.  The Amended Complaint Properly Alleges Loss Causation ......................... 18

   III.  THE AMENDED COMPLAINT STATES A CLAIM FOR SECURITIES FRAUD
       PURSUANT TO SECTION 890 OF THE PRUSA ...................................... 20

   IV.  THE AMENDED COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT
       .................................................................................................................. 22

   V.   THE AMENDED COMPLAINT STATES CLAIMS FOR UNJUST ENRICHMENT
       AND CONSTRUCTIVE TRUST ............................................................... 23

   VI.  THE AMENDED COMPLAINT STATES A CLAIM FOR DOLUS/FRAUD............ 24

   VII. THE AMENDED COMPLAINT STATES A CLAIM FOR BAD FAITH.................... 24

   VIII. LEAVE TO AMEND SHOULD BE GRANTED SHOULD THE COURT DISMISS
       ANY OF PLAINTIFF'S CLAIMS .............................................................. 25

CONCLUSION..................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*ACA Fin. Guar. Corp.*,
  512 F.3d 46 (2008) ............................................................................ 8, 9, 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 4

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007) ................................................................................... 4

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................. 18

*Endico v. Fonte*,
  485 F. Supp.2d 411 (S.D.N.Y. 2007) ....................................................... 14

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000) ............................................................... 19, 20

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ................................................................................... 9

*Evergreen Partnering Group, Inc. v. Pactive Corp.*,
  720 F.3d 33 (1st Cir. 2013) ........................................................................ 4

*Feliciano-Munoz v. Rebarber-Ocasio*,
  970 F.3d 53 (1st Cir. 2020) ...................................................................... 25

*Fletcher Int'l, Ltd. v. ION Geophysical Corp.*,
  2010 WL 2173838 (Del. Ch. May 28, 2010) ............................................ 14

*Grippo v. Perazzo*,
  352 F.3d 1218 (11th Cir. 2004) .................................................................. 6

*Guray v. Winehouse*,
  235 F.3d 792 (2d Cir. 2000) ....................................................................... 9

*In Re Credit Suisse-AOL Sec. Litig.*,
  465 F. Supp.2d 34 (D. Mass. 2006) .......................................................... 20

*Jacquith v. Newhard*,
   1993 WL 127212 (S.D.N.Y. Apr. 20, 1993) ...................................................... 17, 18

*Johnson v. Computer Tech. Servs., Inc.*,
   670 F. Supp. 1036 (D.D.C. 1987) ............................................................... 14

*Keith v. Black Diamond Advisors, Inc.*,
   48 F. Supp.2d 326 (S.D.N.Y. 1999) ........................................................... 14

*Landreth Timber Co. v. Landreth*,
   471 U.S. 681 (1985) ........................................................................... 12

*Lass v. Bank of America, N.A.*,
   695 F.3d 129 (1st Cir. 2012) ................................................................... 23

*Leemon v. Burns*,
   175 F. Supp.2d 551 (S.D.N.Y.2001) ................................................. 13, 14, 15, 16

*Luce v. Edelstein*,
   802 F.2d 49 (2d Cir. 1986) ...................................................................... 8

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982) ........................................................................... 14

*Mendez Moll v. AXA Equitable Life Ins. Co.*,
   202 D.P.R. 630 (2019) ......................................................................... 22

*Miller v. Holtzbrinck Publishers, LLC*,
   2009 U.S. Dist. LEXIS 18973 (S.D.N.Y. Mar. 3, 2009) ............................................ 8

*National Bank of Yugoslavia v. Drexel Burnham Lambert, Inc.*,
   768 F. Supp. 1010 (S.D.N.Y. 1991) .......................................................... 16, 17

*New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
   537 F.3d 35 (1st Cir. 2012) .................................................................... 10

*Olivella Zalduondo v. Triple-S, Inc.*,
   187 D.P.R. 625 (2013) ......................................................................... 21

*Osteporosis & Rheumatology Center of Tampa Bay, LLC v. Cynosure, Inc.*,
   2022 U.S. Dist. LEXIS 164695 (D. Mass. Sept. 12, 2022) ......................................... 8

*Pollack v. Laidlaw Holdings, Inc.*,
   27 F.3d. 808 (2d Cir. 1994) .................................................................... 13

*Portugues-Santana v. Rekomdiv Intern.*,
  657 F.3d 56 (1st Cir. 2011)...................................................................... 25

*Private Corporate Advisors, Inc. v. Heard*,
  1995 WL 66647 (S.D.N.Y. Feb. 17, 1995) ...................................... 13, 18

*Puerto Rico Tourism Co. v. Priceline.com, Inc.*,
  2015 WL 5098488 (D.P.R. 2015)............................................................. 24

*Reves v. Ernst & Young*,
  494 U.S. 56 (1990).......................................................................... passim

*Rodriguez Cadiz v. Mercado Jimenez*,
  579 F. Supp. 1176 (D.P.R. 1983).............................................................. 14

*Sanchez-Cardona v. Corporate Planners, Inc.*,
  895 F. Supp. 26 (D.P.R. 1995) .................................................................. 14

*Scottsdale Ins. Co. v. McGrath*,
  506 F. Supp.3d 216 (S.D.N.Y. 2020) ........................................................ 13

*SEC v. Constantin*,
  939 F. Supp.2d 288 (S.D.N.Y. 2013) ................................................. 13, 14

*SEC v. Scott*,
  2015 WL 13742024 (E.D.N.Y. July 15, 2015)................................... 15, 17

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1947)................................................................................... 12

*SEC v. Wallenbrock*,
  313 F.3d 532 (9th Cir. 1992).............................................................. 15, 17

*SEC v. Zandford*,
  535 U.S. 813 (2002).................................................................................... 6

*Stier v. Girl Scouts of the USA*,
  383 F.3d 7 (1st Cir. 2004) ......................................................................... 25

*Superintendent of Ins. of State of N.Y. v. Bankers Live & Cas. Co.*,
  404 U.S. 6 (1971)...................................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).................................................................................. 10

*United Auto., Aerospace, Agr. Implement Workers of America Intern. Union v. Fortuno*,
   633 F.3d 37 (1st Cir. 2011)......................................................................................... 22

*United States v. Han*,
   280 F. Supp.3d 144 (D.D.C. 2017) .......................................................................... 15

*Wharf (Holdings) Ltd. v. United Intern. Holdings, Inc.*,
   523 U.S. 588 (2001).................................................................................................... 8

*Wortley v. Camplin*,
   214 F. Supp.2d 18 (D. Maine 2002) .......................................................................... 9

Statutes

10 L.P.R.A. § 890......................................................................................................... 21

15 U.S.C. § 78c(a)(10)............................................................................................. 12, 13

P.R. Laws Ann. tit. 31, § 7 ........................................................................................... 24

Rules

Fed. R. Civ. P. 8(d)(3) ................................................................................................. 23

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 2

Fed. R. Civ. P. 15(a) .................................................................................................... 25

Plaintiff Fahad Ghaffar ("Ghaffar") respectfully submits this Brief in opposition to the motion to dismiss filed by Defendants John Paulson ("Paulson") and Paulson PRV Holdings, LLC (together, the "Paulson Defendants") on October 12, 2023.

## PRELIMINARY STATEMENT

The Paulson Defendants' motion should be denied in its entirety.  The allegations of the Amended Complaint are straightforward and must be accepted as true at the pleading stage. Ghaffar indisputably invested nearly $17 million over 19 months ago in exchange for a convertible note (the "Convertible Note") that was to provide him with a share of the profits and an equity interest in a luxury automotive business but has never received the Convertible Note.  Defendants go to great lengths to ignore this basic and inescapable fact.  This case is not about *drafts* of a convertible note that do not reflect the agreed terms or correspondence evidencing a convertible note that was never delivered.  It is about Defendants' failure to deliver the Convertible Note and continuing fraudulent conduct, the wrongful denial of the investment benefits conferred by the Convertible Note, and the resulting loss of the value of Ghaffar's investment, including the substantial sum that Ghaffar invested as consideration for the purchase of that security instrument.

The very first paragraph of the Amended Complaint plainly refers to the Convertible Note that Paulson "failed to ever produce."  The Paulson Defendants do not and cannot rebut this allegation.  Rather, they refer to unsigned drafts that do nothing to overcome Ghaffar's allegations that he invested $17 million in exchange for the Convertible Note with agreed upon terms as represented to him by Paulson and that the Paulson Defendants failed to deliver.  The Paulson Defendants erroneously claim that Ghaffar's allegations are "flatly refuted by the very emails he selectively quotes in the Complaint."  Defs. Br. at 1.  As further discussed below, those e-mails are consistent with and support the allegations of the Amended Complaint that Paulson misrepresented

the terms of the security transaction and engaged in a course of fraudulent conduct.  In any event, at most the Paulson Defendants' arguments regarding those e-mails give rise to a disputed factual issue that is not appropriate for resolution on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

In sum, the Paulson Defendants' motion rests on misapplication of the controlling standard. The Amended Complaint alleges a final, contemporaneous securities transaction, not something to be further negotiated and eventually agreed.  It asserts that the security was never delivered (despite the investment funds being paid immediately), and that the terms of the transaction were knowingly misrepresented.  On a motion to dismiss, those allegations must be accepted as true and the alternative inferences that the Paulson Defendants ask the Court to draw must be rejected.

Like the securities fraud claim, the remaining claims in the Amended Complaint are straightforward and satisfy the pleading elements.  The Paulson Defendants' arguments with respect to these claims similarly depend on ignoring the allegations of the Amended Complaint and asking the Court to improperly draw inferences in their favor.  The inconsistent and contradictory arguments put forth by the Defendants underscore their lack of merit.  Thus, Defendants argue first that the claim is not one for securities fraud, but a claim for breach of contract.  Then they argue there is no contract, ignoring their own assertion that they complied with their contractual obligations by providing a draft convertible note.  Finally, Defendants argue that the unjust enrichment claim should be dismissed based on the contractual terms alleged in the Amended Complaint.  Defendants advance these conflicting arguments while completely ignoring that Ghaffar incontestably paid close to $17 million to obtain an equity interest and a share of the profits in the business through the Convertible Note, which is an enumerated security under both the Securities Act of 1933 and the Securities Exchange Act of 1934.  Defendants have failed to

provide the Convertible Note in accordance with the terms as represented to Ghaffar and continue to withhold the benefits to which he is entitled.

## ALLEGATIONS OF THE COMPLAINT

The allegations of the Amended Complaint will not be repeated at length herein, but for the Court's convenience, we note the following significant allegations:

18. Paulson told Ghaffar that in exchange for his investment he would receive a 50% membership interest in V12 [V12 Land LLC] and a convertible note made by PRV (the "Convertible Note") which was to have the following features: a) until F40 [F40 LLC]obtained approval from the auto manufacturers for Ghaffar to hold a direct membership interest, [FN] Ghaffar was to receive (i) 10% of the net profits annually for his service to the company and (ii) a profits interest amounting to 50% of the annual profits remaining after the 10% (essentially Ghaffar's salary) was deducted; and b) after F40 obtained approval for Ghaffar's membership interest, Ghaffar's profit interest would automatically convert to a 50% membership interest in F40 and Ghaffar would only receive 50% of the distributed profits.

19. Based on the above representations by Paulson regarding the Convertible Note, on or about February 7, 2022, Ghaffar wired $16,705,000 million to complete the purchase of the Convertible Note. The money first was wired to a "Paulson Advisors" account and then, upon information and belief, transferred to PRV.

20. The representations by Paulson regarding the profits interest and conversion of the Convertible Note were knowingly false when made.

Additionally, the Complaint alleges the following:

- In the intervening months between the wiring of Ghaffar's investment funds and the commencement of this action, as part and parcel of his fraud against Ghaffar, the Paulson Defendants have made numerous misleading representations that the Convertible Note or documentation thereof would be forthcoming. Amended Complaint ¶¶ 23-27.

- After nearly 19 months of being misled and tricked, Ghaffar made a formal and explicit demand for documentation evidencing the Convertible Note. This request was *not* met with delivery of the Convertible Note, but with further false promises of an instrument for "consideration," not the instrument that was promised in the finalized deal alleged in paragraph 18. Amended Complaint ¶¶ 29-30.

- After the initial Complaint in this action was filed (and prior to the filing of the Amended Complaint), Paulson caused his accountants to provide Ghaffar with a Schedule K-1 correctly showing Ghaffar's interest in V12. Simultaneously, however, Ghaffar also

received a fraudulent K-1 showing a 3% interest in an entity that Ghaffar had never agreed to invest in, thereby confirming the misappropriation of Ghaffar's funds.   Amended Complaint ¶¶ 31-32.

- The promise of a profits interest in F40 was false when made and has remained false as Ghaffar has never received the 2022 profits interest promised to him by Paulson, as set forth in paragraph 18.  Amended Complaint ¶ 40.

Accordingly, the Amended Complaint, when read as a whole, alleges that Defendants knowingly misrepresented the terms of the transaction in connection with Ghaffar's purchase of a security, and continued to engage in an ongoing course of fraudulent conduct, which has resulted in direct and readily quantifiable damages to Ghaffar.

## **ARGUMENT**

### I.     **THE APPLICABLE STANDARD ON A MOTION TO DISMISS PURSANT TO RULE 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).   In making this determination, the Court "may at this early stage only accept as true all factual allegations contained in a complaint, make all reasonable inferences in favor of the plaintiff, and properly refrain from any conjecture as to whether […] allegations may prove deficient at the summary judgment or later stages." *Evergreen Partnering Group, Inc. v. Pactive Corp.* 720 F.3d 33, 45 (1st Cir. 2013) (*quoting Twombly*, at 555-56).

The Paulson Defendants' motion is based on either mischaracterizing the allegations of the Amended Complaint or simply ignoring them.   In turn, Defendants argue that their conflicting version of the Amended Complaint and their competing inferences should be accepted.   As set forth more fully below, this gambit contravenes the applicable standard at the pleading stage and must be rejected.

II.    **THE AMENDED COMPLAINT SATISFIES EACH OF THE ELEMENTS FOR PLEADING A CLAIM FOR SECURITIES FRAUD PURSUANT TO SECTION 10(b) AND RULE 10b-5**

    A.    ***The Complaint Pleads a Material Misrepresentation***

The Amended Complaint, and in particular paragraph 18, pleads that Paulson represented to Ghaffar that he was to receive the Convertible Note with certain specified features in exchange for his investment.  The Amended Complaint further pleads that based on those representations Ghaffar did in fact invest millions of dollars, *i.e.*, it alleges a contemporaneous, finalized securities transaction between Ghaffar and the Paulson Defendants whereby Ghaffar was to receive a security with certain agreed terms, but that Ghaffar did not receive that security, or any security for that matter.  At this stage, these allegations must be accepted as true.

The Paulson Defendants first attempt to argue that the alleged misrepresentations were statements of future intent, not present fact, and that the Amended Complaint only alleges that the Defendants would at some "unspecified time" deliver the Convertible Note to Plaintiff.  Defs. Br. at 8.  This badly mischaracterizes the Amended Complaint.  To begin with, the Amended Complaint clearly alleges that in exchange for his investment, Ghaffar was to receive the Convertible Note incorporating the agreed and existing terms as represented by Paulson, not at some future date, but contemporaneously.  Indeed, Ghaffar's investment consisting of $16,705,000, was wired on February 7, 2022. Amended Complaint ¶ 19.  The Paulson Defendants' motion asks this Court to make the unreasonable inference that Ghaffar did so with the belief that perhaps at some unspecified time in the distant future he might receive the Convertible Note and the agreed benefits from that security, including his share of the profits.  This should be rejected.  This action was commenced over 19 months after Ghaffar's investment, during which entire time Paulson has had use of Ghaffar's funds.  Ghaffar has *never* received the Convertible Note, and the

Paulson Defendants have not complied with their obligations under the terms of the undelivered Convertible Note as represented and as described in paragraph 18 of the Amended Complaint.

Second, instead of responding to the actual allegations of the Amended Complaint, Defendants make the baseless argument that Ghaffar received the Convertible Note.  This is patently false.  Instead of providing the Convertible Note, Defendants proffer a marked up, unsigned draft sent in June of 2022, over four months after Ghaffar's investment, that irrefutably did not reflect the actual terms of the securities transaction as represented to Ghaffar.  The non-conforming draft note provided by Defendants underscores that Paulson has used the intervening 19 months to continue to prevaricate and string Ghaffar along.[1]  Significantly, the non-conforming draft note did not include the profit interest to be included with the Convertible Note as alleged in paragraph 18 of the Amended Complaint.  It also introduced a new entity, unfamiliar to Ghaffar, identified only as an unnamed "New Company" or as PCE DE LLC, in which Ghaffar had not agreed to invest.

Furthermore, Defendants ignore the particularly salient allegations of the Amended Complaint in paragraphs 29 and 30, setting forth that Ghaffar made an explicit demand for

---

[1] As set forth in *S.E.C. v. Gallard*, 1997 WL 767570*3 (S.D.N.Y. 1997) "the antifraud provisions [including Rule 10b-5…] are applicable even where, as here, the 'security' at issue does not exist." This accords with precedents holding that the "in connection with" requirement of Section 10(b) and Rule 10b-5 is met even when a security is not actually purchased or delivered.  *See, e.g., Grippo v. Perazzo*, 352 F.3d 1218, 1223 (11th Cir. 2004) (citing to *SEC v. Zandford*, 535 U.S. 813, 819-21 (2002)).  The court in *Gallard* noted that a reasonable investor would consider it material for purposes of the anti-fraud provisions of the Securities Exchange Act "that the money paid for those securities would be misappropriated." *Id*. at *3 (citation omitted).  That is what the Amended Complaint alleges here: Ghaffar made his investment and instead of receiving the promised Convertible Note and the accompanying equity interest and profit interest in F40, his funds were misappropriated and diverted into an entity in which he did not invest.  Finally, the *Gallard* court found that "although the instruments were never delivered, the misrepresentations are still deemed to have been made in connection with their sale." *Id*.  Again, that is what is alleged here: that in violation of Rule 10b-5, the Paulson Defendants fraudulently obtained and misappropriated Ghaffar's investment, and never delivered the security.

"delivery of the documentation evidencing the Convertible Note" and that Paulson did not respond by delivering the executed and actual Convertible Note.  Paragraph 29 of the Amended Complaint is based on a letter sent by Ghaffar's attorneys to Paulson on August 31, 2023, wherein they specifically demanded that Defendants produce the Convertible Note, but they failed to do so, further ratifying the fraudulent course of conduct alleged in the Amended Complaint.

Defendants also ignore additional allegations in the Amended Complaint that further evince their fraudulent conduct.  Paragraphs 31 and 32 allege that after the initial Complaint was filed, the Paulson Defendants – realizing they had been finally called to account for their prior misrepresentations – delivered a Schedule K-1 for V12, and another K-1 for an entity known as Paulson Management IV LLC, an entity in which Ghaffar had never agreed to invest.  The K-1 purporting to provide Ghaffar with an 3% interest in Paulson Management IV demonstrates the falsity of Paulson's representations concerning the features of the Convertible Note, and in particular that Ghaffar would receive a 50% profit interest in F40 that would automatically convert to a membership interest in F40.

Thus, the Paulson Defendants' motion willfully ignores their failure to produce the Convertible Note in response to the express demand therefor, as set forth in the Amended Complaint, and that they provided Ghaffar with a false K-1 that served to confirm the misappropriation of his investment through a different Paulson entity.  The Paulson Defendants' failure to provide the Convertible Note on the terms agreed, while stringing Ghaffar along over the course of over 19 months, ratified the fraudulent nature of Paulson's previous representations and evidences the ongoing course of fraudulent dealing.  Defendants' attempt to draw a competing inference cannot serve as a basis for dismissal at this stage.

Third, with respect to the issue of timing, the Paulson Defendants' attempt to analogize the allegations of the Amended Complaint to those in *ACA Fin. Guar. Corp.*, 512 F.3d 46 (2008) fails completely.  The facts in *ACA* are entirely inapposite and its reasoning irrelevant to this case.  In *ACA*, bondholders brought suit after an issuer defaulted on bond obligations.  Here, the Amended Complaint alleges outright deceit in obtaining Ghaffar's investment in the first instance.  The crux of the allegations in this case is that despite investing millions of dollars, Ghaffar never received the Convertible Note, as if the bondholders in *ACA* never received their bonds.[2]

Fourth, Defendants erroneously argue that the Amended Complaint merely pleads "a promissory statement as to what would be done in the future" and thus cannot support a fraud claim, but only a claim for breach of contract.  Defendants cite to two inapplicable cases from district courts that do not involve Rule 10b-5.[3]  Yet Defendants ignore cases that are on point.  *See Wharf (Holdings) Ltd. v. United Intern. Holdings, Inc.*, 523 U.S. 588, 596-97 (2001) ("United's claim, however, is not simply that Wharf failed to carry out a promise to sell it securities.  It is a claim that Wharf sold it a security (the option) while secretly intending from the very beginning not to honor the option."); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (allegations of "specific promises to induce a securities transaction while secretly intending not to carry them out" are

---

[2]  Moreover, the Paulson Defendants selectively quote an inapposite passage from *ACA* to argue that Paulson's alleged misrepresentation "does not speak in any way to the timing" of the Convertible Note and therefore is not actionable.  In *ACA*, the timing issue did not refer to delivery of the relevant securities themselves, as the Paulson Defendants misleadingly suggest, but to a lack of specificity as to the timing of an equity contribution that might be made to the project being financed by the bond issue, a statement allegedly relied upon by the plaintiffs in making their investment decision.  Here, the misrepresentation is much more fundamental and relates to Defendants' failure to carry out the transaction itself, rather than the occurrence of a separate, prospective event.

[3]  *Cf. Miller v. Holtzbrinck Publishers, LLC*, 2009 U.S. Dist. LEXIS 18973 (S.D.N.Y. Mar. 3, 2009), and *Osteoporosis & Rheumatology Center of Tampa Bay, LLC v. Cynosure, Inc.*, 2022 U.S. Dist. LEXIS 164695 (D. Mass. Sept. 12, 2022).

sufficient to state a claim under Section 10(b)); *Wortley v. Camplin*, 214 F. Supp.2d 18, 20 (D. Maine 2002) (same) (citing to *Luce* and *Guray v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000)).[4]

In any event, the Amended Complaint alleges that Paulson specifically misrepresented the terms of the security transaction and not only that the Paulson Defendants had no intention of providing the Convertible Note as promised. Specifically, the Paulson defendants misrepresented that Ghaffar was to receive a profit interest in F40 which would pay him profits and then automatically convert to a membership interest. Amended Complaint ¶ 18.

Again, the motion to dismiss standard is dispositive. The Paulson Defendants merely offer a competing and inconsistent version of the facts and related inferences, *i.e.*, that they previously delivered a non-conforming version of a convertible note or that they are not yet obligated to deliver the Convertible Note. The Amended Complaint alleges that the Defendants were required contemporaneously to deliver the security that was bargained *and paid for* in February 2022. The Court must credit the well-pled allegations of the Amended Complaint and reject the Paulson Defendants' unreasonable and contrived posturing.

**B.    _The Amended Complaint Adequately Pleads Scienter_**

The Amended Complaint sufficiently alleges scienter as it alleges intentional fraudulent conduct. "Scienter is a mental state embracing intent to deceive, manipulate, or defraud*." ACA Financial*, 512 F.3d at 58 (*quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Here, the Amended Complaint alleges numerous facts supporting the Paulson Defendants' intent to deceive and defraud Ghaffar. "A complaint will survive … if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could

---

[4]  *Wortley* also shows that district courts in the First Circuit regularly look to Second Circuit securities law precedents when First Circuit precedent is not available.

draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 311 (2007). The First Circuit has explained that "[s]cienter must be examined by looking at the complaint as a whole and that 'where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff.'" *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2012) (citing *ACA Fin.*, 512 F.3d at 59).

Paulson is a former billionaire with a complex web of investment vehicles that employ numerous in-house lawyers, accountants, and tax professionals. Yet, as alleged in the Amended Complaint, these personnel were deployed between February of 2022 and September of 2023, when this suit was filed, not to effectuate the transaction entered into between Ghaffar and Paulson, but to repeatedly put Ghaffar off and to mislead him into believing that Paulson's compliance with his obligations was imminent while technical details were being worked out.[5]

In addition, paragraph 27 of the Amended Complaint alleges that on May 16, 2023, Matthew Lebin, Paulson's Head of Tax, once again confirmed the terms of Ghaffar's investment. The cogent and compelling inference to be drawn is that the obligations went unsatisfied because Paulson had not intended to comply with them from the beginning. Thus, the facts alleged support the reasonable inference that Paulson knowingly misrepresented the terms of the transaction in the belief that he could use his financial leverage to minimize Ghaffar's equity interest. This state of

---

[5] Thus, paragraph 25 of the Amended Complaint alleges that in June of 2022 an outside attorney for Paulson purported to confirm the terms of the deal, yet no signed and executed convertible note was forthcoming. Paragraph 26 of the Amended Complaint alleges that Ghaffar inquired regarding the failure to deliver the Convertible Note and Paulson's representatives responded with further deception that "they are still working on the note" because its features are "quite intricate." In fact, the features of the Convertible Note, as alleged in paragraph 18 of the Amended Complaint, were not intricate at all, and would only be cast as intricate based on Paulson having no intention from the outset of honoring what he had agreed to, hence the need for subterfuge and obfuscation.

mind is evidenced by the Paulson Defendants' eventually producing a K-1 showing a 3% interest in a different Paulson-controlled entity, which was only provided after this lawsuit was filed.[6]

The Paulson Defendants make much of their contention that in June of 2022 (four months later), they attached a convertible note for Ghaffar's review and approval and that, according to Defendants, Ghaffar "rejected it and demanded new terms."  Defs. Br. at 8.  As set forth above and alleged in the Amended Complaint, it is readily apparent from the draft note included with Defendants' motion that this draft did not reflect the deal that had been agreed.  Ghaffar did not demand "new" terms, but instead insisted on the already agreed upon terms, not the markedly different ones inserted in this draft.  Thus, the June 2022 draft note is more of the same subterfuge that Ghaffar has faced since he made his investment.  Here, the Amended Complaint makes factual allegations that support the strong inference that Paulson knowingly misrepresented the terms of the transaction, including providing Ghaffar with a 50% share of the profits and an equity interest in F40, as opposed to a 3% interest in a different Paulson entity.  That the Paulson Defendants, for over 19 months, failed to comply with their obligations, and continuously and affirmatively misled Ghaffar into thinking that they would, makes the inference that they acted with scienter all the more cogent and at least as compelling as any opposing inference of non-fraudulent intent.

---

[6]  Here again, the Paulson Defendants seek to offer a competing and internally contradictory version of events that flies in the face of the Amended Complaint, arguing that their provision of a Schedule K-1 for V12 and their September 16, 2023 statement in response to Ghaffar's demand that they would forward a draft note for "consideration," negate the allegations of scienter.  Defs. Br. at 10.  To the contrary, the Schedule K-1 came only after this lawsuit was filed, and its production highlights that there actually is an existing transaction that the Paulson Defendants have only partially complied with as it relates to V12.  As for the promise to provide a draft note, that is both a continuation and ratification of the fraud, coming as it does over 19 months after the securities transaction was to have been documented and without providing Ghaffar with the benefits of his investment.  The time to have provided the Convertible Note and not a draft was then, and Defendants' failure to do so is intrinsic to the fraud perpetrated on Ghaffar.

C.      *The Convertible Note Is a Security*

The Convertible Note clearly constitutes a "security" under the "family resemblance" test established by the Second Circuit and adopted by the U.S. Supreme Court in *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990).  Defendants incorrectly and misleadingly cite to outmoded case law that has been superseded and overturned by the Supreme Court decision in *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 691-92 (1985), and by the Court's subsequent holding in *Reves*, which definitively enunciated the family resemblance test as applicable to notes.

In particular, Defendants' reliance on the so-called "*Howey* test," created in *SEC v. W.J. Howey Co*., 328 U.S. 293 (1947), for purposes of determining whether a note is a "security" is misplaced and directly contrary to *Reves*, in which the Supreme Court resolved a split among the Circuits by expressly rejecting the application of the *Howey* test to notes in favor of the family resemblance test.  *Reves*, 494 U.S. at 64 ("We reject the approaches of those courts that have applied the *Howey* test to notes; *Howey* provides a mechanism for determining whether an instrument is an 'investment contract.'").  *See Landreth Timber*, 471 U.S. at 691 ("the *Howey* economic reality test was designed to determine whether a particular instrument is an 'investment contract,' not whether it fits within *any* of the examples listed in the statutory definition of 'security.'") (emphasis in original).  The Supreme Court in *Landreth Timber* further explained that "applying the *Howey* test to traditional stock and all other types of instruments listed in the statutory definition would make the Acts' enumeration of many types of instruments superfluous."[7] *Id*. at 692.  The Court concluded: "we cannot agree with respondents that the Acts were intended

---

[7]  Section 3(a)(10) of the Exchange Act defines a "security" as including: "*any note*, stock, treasury stock, security future, security-based swap, bond, debenture, … transferable share, investment contract … any put, call, straddle, option, … or in general, any instrument commonly known as a 'security'; …."  15 U.S.C. § 78c(a)(10) (emphasis added).

to cover only 'passive investors' and not privately negotiated transactions involving the transfer of control to 'entrepreneurs.'"  *Id*.  *See also Scottsdale Ins. Co. v. McGrath*, 506 F. Supp.3d 216, 225 (S.D.N.Y. 2020).

Under the family resemblance test adopted in *Reves*, "a note is presumed to be a 'security,' and that presumption may be rebutted only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument."[8]  *See also Pollack v. Laidlaw Holdings, Inc*., 27 F.3d. 808, 811 (2d Cir. 1994)); *Private Corporate Advisors, Inc. v. Heard*, 1995 WL 66647, at *7 (S.D.N.Y. Feb. 17, 1995) ("any note is presumed to be a security unless it falls into one of these judicially-created categories or bears a 'strong family resemblance' to notes in those categories.").  Furthermore, under the *Reves* test, "[i]f the note is not sufficiently similar to one of the non-security instruments, then we must determine whether another category of such instruments should be judicially created by reference to the same four factors, identified in *Reves* as follows: (1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument: (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering the application of the securities laws unnecessary."  *Leemon v. Burns*, 175 F. Supp.2d 551, 558-59 (S.D.N.Y.2001) (quoting *Pollack*, 27 F.3d at 811-12); *see also SEC. v. Constantin*, 939 F. Supp.2d 288, 304 n.11 (S.D.N.Y. 2013).

---

[8]  The judicially-enumerated types of notes that are not securities are: "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character loan' to a bank customer, short-term notes secured by an assignment of accounts receivable, … a note which simply formalizes an open-account debt incurred in the ordinary course of business … [and] notes evidencing loans by commercial banks for current operations.  *Reves*, 494 U.S. at 65.

In this case, the Paulson Defendants have made no attempt to rebut the presumption under the family resemblance test that the Convertible Note sold to Ghaffar is a security within the meaning of the Exchange Act, instead citing cases that are wholly inapposite and pre-date *Reves*.[9] Defendants have therefore effectively waived any such attempt to rebut the presumption under *Reves*. Moreover, several courts applying the family resemblance test "have held that when a convertible note is acquired ostensibly for investment purposes, the note should be considered a security." *Constantin*, 939 F. Supp.2d at 304. *See Leemon*, 175 F. Supp.2d at 559 ("The fact that the Note's original principal could be converted into … common stock is a strong factor for holding that the Note is a security."). *See also Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *5-6 (Del. Ch. May 28, 2010) ("some courts have held convertible notes to be securities without any apparent examination under *Reves*. Other courts have applied the *Reves* factors and, predictably found a convertible note to be a security.") (citations omitted).

---

[9] None of the cases cited by Defendants are on point or even purport to apply the governing *Reves* test. *Cf. Sanchez-Cardona v. Corporate Planners, Inc.*, 895 F. Supp. 26 (D.P.R. 1995) (applying the *Howey* test on a motion for summary judgment to the issue of whether an agreement between the owner of software and investors was an "investment contract" under the securities laws); *Rodriguez Cadiz v. Mercado Jimenez*, 579 F. Supp. 1176 (D.P.R. 1983) (pre-*Landreth Timber* and pre-*Reves* decision applying the *Howey* test on a motion for summary judgment); *Endico v. Fonte*, 485 F. Supp.2d 411 (S.D.N.Y. 2007) (applying the *Howey* test to the issue of whether membership interests in an apartment building were "investment contracts" under the securities laws); *Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp.2d 326 (S.D.N.Y. 1999) (applying the *Howey* test to the question of whether transactions involving membership interests were "investment contracts"); *Johnson v. Computer Tech. Servs., Inc.*, 670 F. Supp. 1036 (D.D.C. 1987) (pre-*Reves* opinion applying the *Howey* test to issue of whether loans constituted "securities" based on D.C. Circuit case law that was rejected and overruled in *Reves* in favor of the Second Circuit approach). *Marine Bank v. Weaver*, 455 U.S. 551 (1982), also cited by Defendants, did not involve the issue of whether a "note" qualified as a security. In that case, the Supreme Court referenced the *Howey* test but found that the business agreement between the parties, which provided for a pledge of a certificate of deposit to guarantee a business loan in exchange for profits from the business, rights to veto future borrowing and rights to the use of a pasture and barn, was of such a "unique character" so as not to constitute a "security." *Id.* at 560. Here, *Reves* and not *Howey* provides the applicable standard. Nor for that matter is there anything particularly idiosyncratic about the Convertible Note at issue in this case.

Here, accepting the allegations of the Amended Complaint as true, it is evident that the Convertible Note "neither fits into any of the judicially-created categories of notes that are not securities nor bears a strong family resemblance to any of those categories," and thus is a security within the meaning of the Exchange Act. *See Leemon*, 175 F. Supp.2d at 559. *See also United States v. Han*, 280 F. Supp.3d 144, 154 (D.D.C. 2017) ("Deciding, at this juncture, whether the promissory notes are securities would require the Court to improperly make 'a determination of facts that should [be] developed at trial.'") (citations omitted).

In any event, application of the four factors identified in *Reves* further compels the conclusion that the Convertible Note is a security.[10]   First and foremost, it is apparent that the transaction was motivated by an investment purpose.  The allegations of the Amended Complaint demonstrate that the Convertible Note was offered to Ghaffar in the investment context of raising capital for ongoing business operations rather than in a commercial or consumer context.  *See Reves*, 494 U.S. at 66 ("If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'  If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security.'"); *see also SEC v. Scott*, 2015 WL 13742024, at *8 (E.D.N.Y. July 15, 2015).

Here, the primary motivation for Ghaffar's purchase of the Convertible Note is alleged to have been that his investment afforded him a share of the profits in conjunction with a managerial

---

[10]  In applying the four-factor test, "failure to satisfy one of the factors is not dispositive; they are considered as a whole."  *SEC v. Wallenbrock*, 313 F.3d 532, 537 (9th Cir. 1992).

role that would facilitate the generation of a long-term return on his investment.[11]  These roles as an investor and an officer of F40 are consistent with an investment motive and thus the transaction as set forth in the Amended Complaint "is most naturally conceived as an investment in a business enterprise rather than as a purely commercial or consumer transaction."  *Reves*, 494 U.S. at 68.

Second, as to the plan of distribution, although in this case the Convertible Note was not offered to the public, it is well-established that the instrument need not be publicly distributed to constitute a security.  *See Leemon*, 175 F. Supp.2d at 559 n.14 ("That there is no indication that any public distribution of the Note was intended does not take the transaction in this case outside of the protection of the federal securities laws.") (citing cases from several Circuits holding that the note need not be publicly distributed).  *See also National Bank of Yugoslavia v. Drexel Burnham Lambert, Inc*., 768 F. Supp. 1010, 1015-16 (S.D.N.Y. 1991) ("A debt instrument may be distributed to but one investor, yet be a 'security.'  Any other interpretation of *Reves* would contradict the Supreme Court's determination that in the federal securities laws Congress 'enacted the definition of a "security" sufficiently broad to encompass virtually any instrument that might be sold as an investment.'") (citations omitted).  Moreover, Fahad is an individual, private investor rather than an institutional investor, further warranting regulation of the Convertible Note under the anti-fraud provisions of the federal securities laws.  *See Leemon*, 175 F. Supp.2d at 559 ("Plaintiff was told that in return for his investment of $150,000 he would receive a promissory note" and "appointment to a position of authority of AMDL").

Third, with respect to the public's expectations, courts "will consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the

---

[11]  Although Ghaffar was the CEO of F40, he did not exercise ownership control.  As alleged in the Amended Complaint, F40 was owned by PRV, and Paulson purported to remove Ghaffar from all of his managerial positions with F40 in August 2023.  Amended Complaint ¶ 28.

circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction."  *SEC v. Scott*, 2015 WL 13742024, at *9 (quoting *Reves*, 494 U.S. at 66).  In this case, it could be reasonably found that the investing public would view an unsecured promissory note that automatically converted into an equity stake in the business, with the purchaser expecting to receive a substantial return on investment, as an investment in a security. *See id.*; *Jacquith v. Newhard*, 1993 WL 127212, at *9 (S.D.N.Y. Apr. 20, 1993).[12]  Nor in this instance are there any of the risk reducing factors associated with commercial loans, such as the provision of collateral or insurance, and consequently Ghaffar bore the investment risk.  *See National Bank of Yugoslavia.*, 768 F. Supp. at 1016 (noting absence of risk-reducing factors).

Finally, as to the fourth factor, in this case there is no alternate regulatory scheme or other factor that would "render[ ] application of the Securities Acts unnecessary."  *SEC v. Scott*, 2015 WL 13742024, at *9 (quoting *Reves*, 494 U.S. at 67).  *See SEC v. Wallenbrock*, 313 F.3d at 540 ("the fact that a company is subject to regulation by a single state is not nearly enough to remove the company from the umbrella of the federal securities laws" and concluding that that the notes "do not bear the characteristics of non-security instruments, and because the indicia of an investment are so strong, we decline to add them to the list of instruments exempted from the federal securities laws."); *National Bank of Yugoslavia.*, 768 F. Supp. at 1016 (finding that "there is no regulatory scheme which so significantly reduced the risk of the time deposits as to make

---

[12]  Furthermore, the record supports the conclusion that the parties themselves certainly had reason to believe that the Convertible Note was an investment in a security.  The draft note proffered by Defendants, although it does not reflect the terms of the transaction as represented, is denominated a Convertible Promissory Note and provides in the first paragraph that the "Obligation and other amounts payable hereunder shall be payable on the first (1st) anniversary from the date of issuance … unless *converted into securities of the Company* as provided in Section 4 below."  Affirmation of Andrew Urgenson, Exhibit A (emphasis added).  Section 4 of the draft in turn states that the Lender has the right at any time during the term of the note to convert the principal amount into "Equity Interest of the Company."  *Id*.

application of the federal securities laws unnecessary" and holding that the transactions as pleaded involved "securities").[13]

In sum, the Paulson Defendants have made no attempt to rebut the presumption under *Reves* that the Convertible Note is a security, thereby effectively conceding that the Convertible Note is a "note" under§ 3(a)(10) of the Exchange Act.  In any event, the Convertible Note does not fit within or resemble any of the judicially-created categories of instruments that are not securities.  Moreover, as set forth above, the factors articulated in *Reves* strongly support the conclusion that the Convertible Note is a security and that the creation of another category of note instrument exempted from the reach of the federal securities laws is unwarranted.  The Amended Complaint accordingly incontestably alleges the sale of a security for the purpose of stating a claim under Section 10(b).

### D.   *The Amended Complaint Properly Alleges Loss Causation*

Loss causation is the "causal connection between the [defendants'] material misrepresentation and the [plaintiff's] loss."  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Here, the Amended Complaint alleges that Ghaffar invested nearly $17 million in exchange for the Convertible Note with clearly delineated investment features, including a share

---

[13]  *See also Private Corporate Advisors, Inc. v. Heard*, 1995 WL 66647, at *8 ("although it was not intended that the Note be publicly traded, because [defendant's] purpose was to raise money 'to finance substantial investments,' because [plaintiff] intended to earn a profit from this transaction, and there are no material risk reducing factors rendering application of the Securities Act unnecessary, I find that the Note neither fits into one of the judicially-created categories nor bears a strong family resemblance to one of them.  I must construe the Securities Act broadly to effectuate Congress's purpose to protect investors, in particular at this stage of the proceedings."); *Jacquith v. Newhard*, 1993 WL 127212, at *10 ("While the second factor favors the defendants, the remaining *Reves* factors strongly support classifying the agreements as 'securities.'  Since the subordination agreements can be characterized properly as 'securities' based upon the allegations in the complaint, the alleged misrepresentations surrounding the initial investment are within the scope of a 10b-5 claim.").

of the profits and an equity interest in a limited liability company that increased in value. Defendants' failure to deliver the security and fulfill the agreed terms has caused Ghaffar to lose the value of his investment.[14]

The Paulson Defendants' arguments regarding loss causation once again ignore allegations on the face of the Amended Complaint, particularly that Ghaffar invested $16,705,000 that is now controlled by the Paulson Defendants.  More specifically, paragraph 40 of the Amended Complaint plainly alleges that Ghaffar has not been paid his share of the profits due to him for 2022 pursuant to the terms that the undelivered Convertible Note.  The right to share in the investment profits is described in paragraph 18 of the Amended Complaint and the fact that there were profits, which doubled in about one year, is set forth in paragraph 22.  Defendants' arguments simply ignore that Ghaffar was to receive a profit interest in F40 prior to his being admitted as a member.

Most of the cases discussing loss causation, cited by Defendants generally, deal with the typical securities fraud case, where the claim is based on misrepresentations or omissions that affected the price of a publicly traded security.  Courts have noted the difficulty in applying precedent developed in typical cases to non-typical cases with underlying facts similar to this case, which involves private communications and face to face transactions.  *See, e.g., EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 871-72 (3d Cir. 2000).  Nevertheless, it is undisputed that in enacting Section 10(b), "Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face."  *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971).

---

[14]  To the extent that the Paulson Defendants have actually delivered the promised membership interest in V12, Ghaffar has not suffered that loss, however he has suffered a loss with respect to the other aspects of the transaction, including the profits interest in F40 (prior to conversion) and the membership interest in F40 (after conversion), which has increased in value since Ghaffar's investment.

In *EP Medsystems*, the Court considered allegations similar to those in this case, where the plaintiff claimed "that as a result of fraudulent communications by EchoCath Executives, it was induced to make an investment of $1.4 million which turned out to be worthless," and went on to conclude "[t]he causation issue becomes most critical at the proof stage."  Thus, "[w]hether the plaintiff has proven causation is usually reserved for the trier of fact."  *Id*. at 884 (citation omitted). The Court further found that at the pleading stage, when drawing all reasonable inferences in the plaintiff's favor, the allegation that plaintiff "sustained substantial financial losses as a direct result of the aforementioned misrepresentations and omissions on the part of EchoCath" was sufficient. *Id.* at 885.  District courts within the First Circuit have held similarly and harmonized their holdings with *Dura*, noting that *Dura* "reaffirmed the notion that the loss causation pleading requirements should be interpreted so as not to impose a significant burden on plaintiffs."  *See In Re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp.2d 34, 45-46 (D. Mass. 2006).

With this guidance in mind, along with the applicable standard for a Rule 12(b)(6) motion, Ghaffar has readily alleged loss causation, *i.e*., the complete loss or at least substantial diminution of his investment based on fraudulent representations as to what he was to receive in exchange for his invested funds.  The Paulson Defendants' arguments ignore entirely that under the Convertible Note Ghaffar was to receive a profit interest in F40 prior to his being admitted as a member.  The cases cited by the Paulson Defendants concerning speculative future harm are accordingly entirely off base as the Amended Complaint alleges damages which have already occurred.

### III.  THE AMENDED COMPLAINT STATES A CLAIM FOR SECURITIES FRAUD PURSUANT TO SECTION 890 OF THE PRUSA

Ghaffar's claim under the Uniform Securities Act of Puerto Rico ("PRUSA") is sufficient and the Paulson Defendants' arguments fail for the same reasons that their arguments concerning

the Rule 10b-5 claim fail.  Indeed, the Paulson Defendants point out the similarity between Rule 10b-5 and the anti-fraud provisions of PRUSA.

Defendants offer the additional, erroneous argument that PRUSA only applies to entities engaged in the securities business.  This is incorrect.  Defendants rely on *Olivella Zalduondo v. Triple-S, Inc.*, 187 D.P.R. 625 (2013) for the notion that PRUSA only applies to "a transaction with entities engaged in the securities business."  Defs. Br. at 15.  However, this ignores the plain language of the statute, as well as additional relevant language in *Olivella*.  No limitation to the securities industry appears in this relevant section.[15]  Moreover, Defendants ignore additional language in *Olivella* that reconciles the language they selectively quote with the plain language of the statute.  The *Olivella* court noted that "the main purpose, *although not exclusive*, of said Law is to prevent fraud and ensure the proper registration of securities and their brokers."  *Id.* at 627-28 (emphasis added).  The *Olivella* court went on to analyze the particular transaction at issue, which involved a share redemption, and in finding that it was not covered by PRUSA, added the important distinction that "[n]or is it a purchase of securities in which there was fraud, or deceit."  *Id.* at 648.  Here, in contrast, the Amended Complaint specifically alleges the purchase of a security involving fraud and deceit.

---

[15]  Section 890 of PRUSA reads as follows:

> "(a) Any person who:
>
>> (2) offers or sells a security by means of a false statement of a material fact or omitting to state a material fact needed to prevent that any statement made, in the light of the circumstances under which it was made, leads to misunderstanding (the buyer not knowing of the falsehood or omission), and does not support the burden of proof that he did not know, and in exercising reasonable prudence could not have known of the falsehood or omission, shall be liable to the person who buys the security, who may file suit …"

10 L.P.R.A. § 890.

Accordingly, the Paulson Defendants' argument fails under the plain language of the statute, as well as the case on which they rely, and that portion of their motion which seeks dismissal of the PRUSA claim should be denied.[16]

## IV.     THE AMENDED COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT

With respect to Ghaffar's breach of contract claim, the Paulson Defendants again ask this Court to impermissibly draw an inference in their favor.  Defendants ask the Court to credit their preferred inference that sending an unsigned and difficult to decipher draft note, which did not reflect the agreed terms of the investment, constitutes performance under the contract.[17]  The Amended Complaint, however, alleges a completed contract, with final terms that Ghaffar relied upon in making his investment, which the Paulson Defendants breached by never delivering the Convertible Note and by failing to pay Ghaffar his share of the profits to which he was contractually entitled.  On this Rule 12(b)(6) motion, Ghaffar's allegations must carry the day.

Likewise, the Paulson Defendants' argument that there was no deadline by which they were obligated to deliver the Convertible Note, and therefore they cannot be in breach, is makeweight. It too is nothing more than a competing and strained inference.  The allegations of the Amended Complaint, and the far more reasonable inference to be drawn therefrom, are that the Paulson Defendants were obligated to deliver the Convertible Note without delay, once Ghaffar had accepted the terms by wiring his $17 million investment.  Not only must the Paulson Defendants'

---

[16]  *Mendez Moll v. AXA Equitable Life Ins. Co.*, 202 D.P.R. 630 (2019) confirms that the Paulson Defendants' reading of *Olivella* is incorrect, stating that *Olivella* clearly established that although every dispute involving a security is not necessarily subject to PRUSA, it is not so narrow that it only applies to regular securities industry participants.  Rather, the determination is made on a case by case basis, based on the underlying facts.

[17]  Defendants also ask the Court to impermissibly go beyond the pleadings on this Rule 12(b)(6) motion.  *See, e.g.*, *United Auto., Aerospace, Agr. Implement Workers of America Intern. Union v. Fortuno*, 633 F.3d 37, 39 (1st Cir. 2011).

argument in this regard be rejected pursuant to the applicable standard, but it is absurd on its face. Taken to its logical conclusion, the Defendants obtained Ghaffar's nearly $17 million investment with absolutely no strings attached, and could avoid delivering the Convertible Note indefinitely. This absurd argument also belies the Paulson Defendants' additional contention that the Amended Complaint fails to allege that Ghaffar suffered any actual harm.  According to their own interpretation, the Paulson Defendants obtained nearly $17 million from Ghaffar without providing him with the security instrument evidencing his investment, his right to a share of the profits, and his ongoing equity interest.

## V.        THE AMENDED COMPLAINT STATES CLAIMS FOR UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST

The Paulson Defendants' arguments regarding the Amended Complaint's claim for unjust enrichment should also be rejected in their entirety.  Without any support, Defendants assert that "Ghaffar does not … allege that the PRV was enriched at Ghaffar's expense.  To the contrary … Plaintiff admits that he received all the benefits of the bargain."  Defs. Br. at 20.  This is false on its face and completely divorced from the allegations of the Amended Complaint.

Defendants further argue that there was a contract between the parties, thereby precluding recovery under a theory of unjust enrichment, and that the underlying conduct is addressed by other causes of action.  This is not a proper basis for dismissal at this stage.  It is well-established that a plaintiff may pursue damages for both breach of contract and unjust enrichment at the pleading stage. *See, e.g., Lass v. Bank of America, N.A.*, 695 F.3d 129, 140 (1st Cir. 2012).  Indeed Rule 8(d) explicitly permits pleading in the alternative.  "A party may state as many separate claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).  Accordingly, the Paulson Defendants have offered no basis for dismissing the claim for unjust enrichment.

The Paulson Defendants' sole objection to the claim for constructive trust is that it is a remedy to prevent unjust enrichment. As described above, Ghaffar has stated a claim for unjust enrichment, and accordingly Defendants' argument fails. Moreover, under Puerto Rico law the use of a constructive trust is not limited to the specific cause of action known as unjust enrichment. Rather, it applies more broadly to ill-gotten gains, whether relating to the specific claim of unjust enrichment, fraud, theft, or other means. *See, e.g.*, *Puerto Rico Tourism Co. v. Priceline.com, Inc.*, 2015 WL 5098488, at *7 (D.P.R. 2015) ("[C]onstructive trust, under the right circumstances, is authorized under P.R. Laws Ann. tit. 31, § 7."). Accordingly, there is no basis to dismiss the claim for constructive trust.

## VI.   THE AMENDED COMPLAINT STATES A CLAIM FOR DOLUS/FRAUD

In opposition to the claim for dolus, the Paulson Defendants again assert that the Amended Complaint fails to allege a misrepresentation. As set forth above, this is incorrect. Among other things, the Paulson Defendants made false representations about the terms of the transaction. While the Paulson Defendants argue that under Puerto Rico law, the good faith of contracting parties is presumed, and that such presumption must be rebutted by the plaintiff, here the Amended Complaint easily rebuts that presumption. If the Paulson Defendants had not been deceitful from the outset, they would have delivered the Convertible Note and the payments required thereunder during the intervening 19 months prior to the filing of this action.

## VII.   THE AMENDED COMPLAINT STATES A CLAIM FOR BAD FAITH

The Paulson Defendants' arguments concerning Ghaffar's claim for bad faith are similarly unavailing. Defendants' argument again is that there was no breach of contract, therefore there can be no dolo. Their assertion of no breach is an unwarranted conclusion that must be rejected. Ghaffar has sufficiently alleged a breach of contract and the Amended Complaint is replete with

24

allegations showing the Paulson Defendants' bad faith, both from the outset of the negotiation for Ghaffar's investment, and subsequently.

The Paulson Defendants' repeated false assurances of imminent delivery of the Convertible Note sufficiently support allegations of both dolo in the formation of the contract and dolo in the performance of the contract.  In this regard, "[d]olo can take two forms: (1) dolo in the formation of contracts, and (2) dolo in the performance of contractual obligations."  *Portugues-Santana v. Rekomdiv Intern.*, 657 F.3d 56, 59 (1st Cir. 2011).[18]  Put another way, the fraud that tainted the formation of the agreement between Ghaffar and the Paulson Defendants continued and was ratified during the intervening 19 months, as the Paulson Defendants repeatedly and intentionally falsely promised to deliver the Convertible Note.

## VIII.      LEAVE TO AMEND SHOULD BE GRANTED SHOULD THE COURT DISMISS ANY OF PLAINTIFF'S CLAIMS

It is well-settled that pursuant to Fed. R. Civ. P. 15(a) leave to amend a complaint should be freely granted when justice so requires.  *See, e.g.*, *Stier v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004).  Here, the Amended Complaint plainly alleges wrongful conduct giving rise to liability, and therefore the dismissal of any claim would not be based on any underlying lack of merit.  Accordingly, the dismissal of any claim should provide for leave to amend.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny the Paulson Defendants' motion to dismiss in its entirety.

---

[18] Dolo in the performance of a contract, "incidental" dolo, gives rise to a claim for damages, whereas dolo in the formation of a contract provides for recission of the contract.  *See, e.g., Feliciano-Munoz v. Rebarber-Ocasio*, 970 F.3d 53, 62-63 (1st Cir. 2020).

Respectfully Submitted,

Dated: November 9, 2023

/s/ Harold D. Vicente Colon
Harold D. Vicente-Colón
USDC -PR 211805
/s/ Harold D. Vicente Gonzalez
Harold D. Vicente Gonzalez
USDC-PR 117711
Vicente Law LLC
Capital Center Sur Ph1-1201
239 Arterial Hostos
Hato Rey
Tel. (787) 751-8000
Fax (787) 756-5250
hdvc@vclawpr.com

/s/ José A. Andréu-Fuentes
José A. Andréu-Fuentes
USDC 204409

/s/ Alfred M. Umpierre-Soler
Alfredo M. Umpierre-Soler
USDC-PR 226205
261 Ave. Domenech
San Juan, PR 00918-3518
787.754.1777
jaf@andreu-sagardia.com

RUSSO PLLC

/s/Martin P. Russo
Martin P. Russo (*Pro Hac Vice*)
Robert Sidorsky (*Pro Hac Vice*)
Daniel Branower (*Pro Hac Vice*)
350 Fifth Avenue, Suite 7230
New York, New York 10118
(212) 363-2000
martin@russopllc.com

26