## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FAHAD GHAFFAR, | CIVIL NO. 23-1455 (CVR) |
| Plaintiff, | |
| vs. | |
| JOHN PAULSON, PAULSON PRV HOLDINGS, LLC, AND PAULSON 2009 FAMILY TRUST | |
| Defendants. | |

## OPPOSITION TO MOTION TO DISQUALIFY FAHAD GHAFFAR'S COUNSEL DUE TO CONFLICT OF INTEREST

TO THE HONORABLE COURT:

COME NOW plaintiff, Fahad Ghaffar, through counsel, and respectfully states and request:

## I.

## INTRODUCTION

In the *Motion to Disqualify* filed in this case ("**Ghaffar-Paulson Litigation**"), the three defendants: **John Paulson**; **Paulson PRV Holdings LLC ("PRV")**; and **Paulson 2009 Family Trust**; are collectively named the "**Paulson Defendants**". They moved for the disqualification of attorney José A. Andréu-Fuentes ("**Andréu**"), together with attorney Alfredo Umpierre-Soler ("**Umpierre**"), for alleged conflicts of interests.

1

The Motion to Disqualify is meritless and is nothing more than a litigation strategy with the purpose of deprived the plaintiff of his most trusted attorneys in this litigation. As it will be discussed further in details, the **Paulson Defendants** have no standing to move for the disqualification of **Andréu and Umpierre.** None of the **Paulson Defendants** have ever been **Andréu's or Umpierre's** clients. Furthermore, under the "entity theory", which is the accepted law in the United States, a lawyer who represents an organization like a corporation, a limited liability company or any other form of legal organization does not represent any affiliated organization and, without more, does not make the affiliate a corporate co-client for purposes of conflict of interest. Therefore, the fact that **Andréu or Umpierre** may have represented an entity that is part of the Paulson corporate conglomerate does not equate to representation by **Andréu or Umpierre** of any other entity forming part of the Paulson conglomerate.

Even under the farfetched assumption that there was a client-lawyer relationship between **Andréu or Umpierre** and any of the **Paulson Defendants**, there is no substantial relationship between **Andréu's or Umpierre's** previous or current representations of Paulson entities and the current representation of **Fahad Ghaffar** in this case. As it will be demonstrated, because neither of the previous representations, or the current ones, are substantially related in any way to the instant case, **Paulson Defendants'** allegation of conflict of interest are meritless. Therefore, the conclusory and general allegations about **Andréu's** and **Umpierre's** supposed acquired knowledge of confidential and sensitive information during the former representations that may cause an advantage to **Ghaffar** or a disadvantage to the **Paulson Defendants** requires a monumental leap in legal reasoning and are not sustained by the applicable law. On the contrary, what is clear here is that the baseless Motion for Disqualify is just a bad faith procedural tactic to harm Ghaffar.

## II.

## ALLEGATIONS IN THE *MOTION TO DISQUALIFY*

The **Paulson Defendants** include two of the more than thirty independent **Paulson's** entities organized as LLC's or regular corporations authorized to do business in Puerto Rico. First, they allege that **Andréu** had a prior attorney-client relationship with co-defendant **PRV**. They state that **PRV** is the Managing Member of another Paulson entity, Duo Condado JV Holdings LLC, ("**Duo Condado**") and that **Duo Condado** is the owner of two hotels operating under the names of La Concha Renaissance San Juan Resort (owned by another **Paulson** entity named Condado Duo La Concha SPV, LL ("**Condado Duo La Concha**"), and the Condado Vanderbilt Hotel (owned by another Paulson entity named Condado Duo Vanderbilt SPV, LL ("**Condado Duo Vanderbilt**"). **Andréu** rendered consultant's services to **Duo Condado** in relation to the negotiation of two rental/lease agreements with two party vendors.

Second, the **Paulson Defendants** further state that **PRV** is the owner of another **Paulson** entity, F40 LLC ("**F40**"). All the **Paulson** entities mentioned are Limited Liability Companies conducting **Paulson's** business activities in Puerto Rico. They add that **Andréu** had a prior relationship with **F40** and conclude that, due to **Andréu's** prior representation of **F40**, together with his supposed prior representation of **PRV**, there is a conflict of interest under Model Rule 1.9 of the ABA Model Rules of Professional Conduct. Model Rule 1.9 prohibits that an attorney may represent a party with an adverse interest to a previous client if the new representation relates to the same, or substantially the same, matter. In other words, they allege that **Andréu's** current representation of **Ghaffar** is substantially related and adverse to: (1) **Andréu's** alleged prior representation of **PRV** due to his representation of **Duo Condado**, an entity owned by **PRV;** and (2) his prior representation of **F40**.

Third, they also allege that **Andréu and Umpierre** are in violation of Model Rule 1.7 of the ABA Model Rules of Professional Conduct that governs conflicts of interest based on a concurrent representation of two clients with adverse interests to each other. As to this allegation, the **Paulson Defendants** assert that **Andréu and Umpierre** are actually representing **Ghaffar** in the **Pagán Díaz Litigation**. However, they allege that in that case **Andréu** and **Umpierre** also are implicitly representing **International Hospitality Restaurants** ("**IHR**") and**,** thus, are also representing **PRV** because **IHR** is an entity owned by **PRV** and both, **Ghaffar** and **PRV**, have adverse interests in relation to each other in the instant case.

The **Paulson Defendants** describe the three specific instances that supposedly configure **Andréu's** or **Umpierre's** conflict of interests as follows.

i.

**<u>FIRST INSTANCE</u> OF ANDRÉU'S ALLEGED CONFLICT OF INTEREST**

**Paulson Defendants** allege that **Andréu** represented them between November 2020 and February 2021. It seems that this allegation is a gross misrepresentation that requires a monumental leap in reasoning. Considered in the most favorable way to **Paulson Defendants**, they are proposing that: (1) between November 2020 and February 2021, **Andréu** represented **Duo Condado** in a matter concerning the La Concha and Vanderbilt Hotels (which is true), properties owned by **Duo Condado** (which is true), another **Paulson** entity (which is true); (2) that **Duo Condado** is owned by **PRV** (which is true)**;** (3) that **PRV** and **Ghaffar** have adverse interests as adversaries in the **Ghaffar-Paulson Litigation** (which is true); (4) that **Andréu's** prior legal representation concerning lease agreements, strategic considerations and other contractual matters directly involving the La Concha and Vanderbilt Hotels are substantially

related to the current litigation (which is false); and (5) that by having represented **Duo Condado**, **Andréu** became **PRV's** legal representation (which is false).

They specifically allege that **Andréu's** prior representation was in relation to a proposed amendment to the STK Restaurant's agreement (STK is a restaurant at the Vanderbilt Hotel); the STK licensing agreement; the reopening of STK which had been closed because of the Covid-19 pandemic; and lease agreements at both La Concha and Vanderbilt Hotels. They add that this representation supposedly entailed constant communications between **Andréu** and Ben Tutt, then General Manager of the Vanderbilt Hotel, to advice and counsel him on matters related to the contracts and agreements object of **Andréu's** legal representation, including strategic considerations surrounding the re-opening of STK Restaurant at the Vanderbilt Hotel.

They further allege, in a conclusory manner and with generalizations, that in **Andréu's** prior representation of **Duo Condado**, he had unqualified access to the hotels' organization, operations, contracts, executives, assets and business relationships, which he could not otherwise obtain from the public domain, and that he gained knowledge of confidential information directly from officers, directors or employees of the **Paulson** entities.

ii.

**<u>SECOND INSTANCE</u> OF ANDRÉU'S ALLEGED CONFLICT OF INTEREST**

**Paulson Defendants** allege that from June to August 2022, **Andréu** represented **F40**, another **Paulson** entity, in the case captioned <u>Bee Fast Corp. v. F40, LLC</u>, Civil No. 22-1290 (SCC), filed before the District Court of Puerto Rico (the "**Ferrari Litigation**"). The **Ferrari Litigation** concerned claims for breach of contract, contractual fraud and unjust enrichment against **F40**.

As **F40**'s counsel in the **Ferrari Litigation**, **Andréu** moved for dismissal of the case for lack of diversity jurisdiction. In support of his dismissal motion, which was granted, **Andréu** presented evidence which showed **F40**'s citizenship as a Limited Liability Company through the citizenship of its sole member, **PRV**. As a corporate officer of **F40**, **Ghaffar** provided an unsworn declaration to authenticate the evidence regarding **F40**'s citizenship and **F40**'s business records, to which **Andréu** supposedly had unfettered access as a result of his direct representation of **F40**. They claim that as a result, **Andréu** allegedly obtained information related to **F40**'s ownership structure, its internal operations and management. The **Paulson Defendants** allege that none of this information would have been obtained but for **Andréu's** representation of his then client **F40**.

In addition, **Paulson Defendants** argue that **Andréu** is well aware of **F40**'s ownership structure because two of the defendants in the **Ghaffar-Paulson Litigation** (**PRV** and **Family Trust**) appear on the **Paulson** organization chart that **Andréu** submitted on **F40**'s behalf in support of the *Motion to Dismiss* filed in the **Ferrari Litigation**.[1] They state that until **Andréu's** filing on behalf of **F40**, this ownership and membership interest information was not public and could not have been found, let alone used in the support of the dispositive argument on **F40**'s behalf regarding the court's lack of subject matter jurisdiction without disclosure to **Andréu** by a **Paulson** entity, corporate officer, representative or employee. They clearly imply that **Andréu** obtained the information relevant to **F40**'s ownership and membership interests from **Ghafar** who, as then Chief Executive Officer of **F40**, had a key executive role with an entity associated with the **Paulson Defendants**.

---

[1] Rule 7.1 of the Federal Rules of Civil Procedure requires that a nongovernmental corporate party, or a nongovernmental corporation that seeks to intervene must file a statement that identifies the parent corporation and any publicly held corporation owning 10% of its stock or states that there is no such corporation.

The **Paulson Defendants** add that in support of the *Motion to Dismiss* in the **Ferrari Litigation**, **Andréu** also submitted a sworn statement from **Ghaffar**, dated July 18, 2022, in his capacity as Chief Executive Officer of **F40**, where he attested under penalty of perjury that as Chief Executive Officer of **F40**, he was familiar with the company's corporate structural organization, business records, communications', contracts, agreements, and business operations. The supposedly confidential and sensitive information obtained by **Andréu** in the prior representation of **F40** in the **Ferrari Litigation** that is allegedly adverse to **Andréu's** current representation of **Ghaffar** in the **Ghaffar-Paulson Litigation** includes the organization of **F40**, the existence and organization of co-defendant **PRV** in the **Ghaffar-Paulson Litigation**, the existence of **Paulson Management IV**, whose majority owner is co-defendant **Family Trust**, and **Paulson's** acquisition, through **F40**, of **Gómez Hermanos' ("GHK")** business and assets, along with **F40**'s finances, operations and developing business relationships and internal and sensitive communications concerning the Convertible Note.

They also state that the mentioned confidential and sensitive information obtained by **Andréu** by virtue of the **Ferrari Litigation** is substantially related to the instant case because the legal issues overlap. In short, in the **Ferrari Litigation** plaintiff alleged that he had entered into a Purchase and Sale Agreement with **F40** to purchase a 2022 Ferrari SF90 Spider and that after paying $800,000 to **F40**, **F40** did not deliver the Ferrari to plaintiff. They state that **F40**, with **Ghaffar** as its Chief Executive Officer, breached the purchase-sale contract, thus incurring in false representation, bad faith and fraud. They state that there is a similarity of allegations in the **Ghaffar-Paulson Litigation** because **Ghaffar** is claiming breach of contract, fraud, bad faith and unjust enrichment against the **Paulson Defendants**. The **Paulson Defendants** point out that as the **Ferrari Litigation** ran its course since the filing of the complaint on June 17, 2022 until

its voluntary dismissal on July 25, 2022 after **Andréu** filed the *Motion to Dismiss*, **Ghaffar** was acting as Chief Executive Officer of **F40** and simultaneously negotiating his ownership agreement or equity interest in **F40**, only to later retain **Andréu** to sue **F40**'s sole owner and member, **PRV**, in the **Ghaffar-Paulson Litigation**.

The **Paulson Defendants** further allege that **Ghaffar** shared with **Andréu** all relevant confidential information and propriety information concerning **F40** and **V12**; the **Paulson Defendants**; and the **Paulson** entities while **Andréu** was **F40**'s legal representation in the **Ferrari Litigation** and, also, while **Andréu** was representing the La Concha and Vanderbilt Hotels at a time that **Ghaffar** had been entrusted with managing **Paulson's** businesses in Puerto Rico, including both hotels. They claim that such alleged access by **Andréu** to confidential and sensitive information concerning the **Paulson Defendants** is substantially related to the **Ghaffar-Paulson Litigation** and to the recently filed case removed to this Federal Court captioned <u>Better Puerto Rico LLC v. Paulson PRV Holdings, LLC</u>, Civil No. 23-1529 (RAM).

iii.

### <u>THIRD INSTANCE</u> OF ANDRÉU'S AND UMPIERRE'S ALLEGED CONFLICT OF INTEREST

The third instance of **Andréu's and Umpierre's** supposed conflict of interest that, according to the **Paulson Defendants**, precludes **Andréu and Umpierre** current legal representation of **Ghaffar** in the **Ghaffar-Paulson Litigation** is related to another civil lawsuit, the **Diaz Pagán Litigation**. The **Díaz Pagán Litigation** refers to a wrongful termination action in which Mr. Díaz alleges that he was terminated from employment by International Hospitality Restaurants, Inc. ("**IHR**"). In his complaint Mr. Díaz included other collateral causes of action in tort against Mr. Ghaffar and other codefendant in their personal capacities, principally related to

certain defamatory statements allegedly made by Mr. Ghaffar and the other codefendant as to the cause of termination of Mr. Díaz's employment with **IHR**.

In the **Díaz Pagán Litigation**, **Andréu and Umpierre** represent **Ghaffa**r. One other co-defendant in the **Díaz Pagán Litigation**, International Hospitality Restaurants, Inc. ("**IHR**") is a **Paulson** entity owned by **Duo Condado**, whose Managing member is **PRV**.[2] **IHR** has been represented by another attorney. **Andréu's and Umpierre's** retainer and legal fees were paid initially by Condado Duo La Concha SPV, LLC ("**Condado Duo**"), another **Paulson** entity, as part of the agreement with Chubb Insurance Company, **Condado Duo**'s insurer, that called for the reimbursement of **Andréu's and Umpierre's** fees. Since an October 11, 2023, letter from **Paulson's** legal counsel to **Andréu and Umpierre**, their fees invoices are now being sent directly to Ghaffar and the insurer.

**Paulson Defendants** allege that although **Andréu and Umpierre** represent **Ghaffar** in the **Díaz Pagán Litigation**, they have become aware of **Paulson Defendant's** confidential and sensitive information because, without executing a joint defense agreement, they have proceeded to liberally exchange information and strategies among legal representatives of all co-defendants. They further allege that as part of the **Díaz Pagán Litigation**, **Andréu and Umpierre** have met with, or exchanged communications with, attorneys from other local law firms who represent, or have represented, the **Paulson Defendants** in other matters, thus, gaining access to confidential and sensitive information concerning the **Paulson Defendants**, including ownership and corporate structure and other information not readily available to the public. They add that, until his termination, **Ghaffar** was supervising, managing and overseeing the operations and

---

[2] Although in the **Díaz Pagán Litigation** there is another co-defendant identified as International Hospitality Enterprises (**IHE**), this last entity is not a Paulson entity. In fact, the complaint against **IHE** was voluntarily dismissed by the plaintiff on July 28, 2022.

management of La Concha and Vanderbilt Hotels, both properties of **Duo Condado** whose Managing member is **PRV**, and that in this capacity, **Ghaffar** had unfettered access to confidential and sensitive information concerning the **Paulson Defendants** which he openly shared with **Andréu and Umpierre**.

**Paulson Defendants** point out that, without executing a formal joint defense agreement, **Andréu and Umpierre** have exchanged and openly shared confidential information with attorneys representing all codefendants, which include two **Paulson** entities, and that they have essentially acted as if they were a single law firm, constantly exchanging e-mails to revise and edit drafts of court filings, discuss legal strategies and circulate information. They imply that **Andréu and Umpierre** have been acting as **IHR** counsel, as well as **Ghaffar**'s, in the **Diaz Pagán Litigation**, and single out that **Andréu and Umpierre** participated in a videoconference with **Paulson** to discuss strategy in the **Diaz Pagán Litigation** in connection with plaintiff's attempts to subpoena **Paulson** to appear at a deposition. Also, that **Andréu** met with the Vice-President of Human Resources of **IHE and IHR** to prepare him for his deposition, all of these acts confirming the joint agreement among co-defendant's counsel, demonstrating the close collaboration between **Andréu and Umpierre**, and counsel for **IHR** and **IHE.**[3]

In sum, **Paulson Defendants** assert that **Andréu and Umpierre** have relied on information obtained directly from **Ghaffar**, as former director and officer of **Paulson's** entities: (1) through **Andréu** prior legal representation of La Concha and Vanderbilt Hotels; (2) through **Andréu** prior representation of **F40** in the **Ferrari Litigation**; and (3) by **Andréu and Umpierre** concurrent representation in the **Díaz Pagán Litigation** of **Ghaffar** and **IHR,** this last one owned by **Duo Condado**, whose Managing Partner is **PRV**.

---

[3] Again, **IHE** is not a Paulson entity. In fact, the Complaint against **IHE** was voluntarily dismissed by the plaintiff on July 28, 2022.

### III.

### APPLICABLE SUBSTANTIVE LAW

To analyze a motion for disqualification, federal district courts look to the local rules promulgated by the district court itself. Velez-Acevedo v. Centro Comprensivo de Cáncer, 2023 WL 6377578, at *1 (D.P.R. Sept 29, 2023), c*iting* Ashe v. Distribuidora Norma, Inc., 2012 WL 12995645, at *2 (D.P.R. Sept. 25, 2012). *See also* Valle-Vega v. Los Magnifikos, Inc., 2021 WL 5750588, at *2 (D.P.R. July 1, 2021); Somascan Plaza, Inc. v. Siemens Medical Systems, Inc., 187 F.D.R. 34, 38 (D.P.R. 1999).

In Vélez-Acevedo, the court *quoted* from United States v. Morell-Corrada, 343 F. Supp.2d 80, 84 (DPR 2004) stating that "[t]he standards for the professional conduct of attorneys in the U.S. District Court of Puerto Rico are the Model Rules of Professional Conduct adopted by the American Bar Association, as amended." Vélez-Acevedo, at *1. The court added, citing Local Civ. R. 83E(a), that "……. each attorney admitted or permitted to practice before this court shall comply with the standards of professional conduct required by the Model Rules of Professional Conduct…adopted by the American Bar Association." *Id.*

The two ABA Model Rules determinative of the Motion to Disqualify are Model Rule 1.9(a), as to conflicts of interest regarding lawyer's duties to former clients, and Model Rule 1.7(a), regarding lawyer's duties to current clients.[4]

### IV.

### STANDARD OF REVIEW FOR MOTIONS TO DISQUALIFY

A motion to disqualify an attorney is an accepted and adequate way for a litigant to bring a potential conflict of interest to the court's attention. *See* Reyes Cañada v. Rey Hernández, 193

---

[4] Thus, any reference to Canons 21 and 38 of the Code of Professional Ethics that applies in Puerto Rico is irrelevant and useless for an analysis regarding the *Motion to Disqualify* in the **Ghaffar-Paulson Litigation**.

F.Supp.2d 409, 411 (D.P.R. 2002), *citing* Somascan Plaza, at 37; Southwire Co. v. Ramallo Bros. Printing, 2009 WL 3429773 (D.P.R. Oct. 19, 2009). Such motions are a legitimate means of remedying one lawyer's unfair advantage over an opponent. Because "the purpose of the rules of professional conduct can be subverted when they are invoked by opposing parties as procedural weapons", Hill v. Culebra Conservation and Development Authority, 599 F.Supp.2d 88 (2009), *quoting* the Preamble to Model Rules of Professional Conduct, courts are called to be cautious in analyzing a disqualification motion because they are often used for strategic purposes. Specially, disqualification during pending litigation is an extreme measure. Velázquez-Vélez v. Molina-Rodríguez, 235 F. Supp. 358, 360 (D.P.R. 2017), *citing* In re Cendant Litigation Corp. Securities Litigation, 124 F. Supp. 2d 235, 249 (D.N.J. 2000). Also, a dash of skepticism is helpful, too, since disqualification may sometimes be sought as a tactical measure "designed to harass opposing counsel". Velázquez Vélez at 360, *citing* Fiandaca v. Cunningham, 827 F.2d 825, 831 (1st Cir. 1987).

This district court has recognized that "[i]t has been a recent practice to use disqualification motions for purely strategic purposes. Estrada v. Cabrera, 632 F.Supp. 1174, 1175, *citing* Smith v. Whatcott, 757 F.2d 1098, 1099-1100 (10th Cir. 1985); Melamed v. ITT Continental Baking Co., 592 F.2d 290, 295 (6th Cir. 1979); International Electronics Corp. v. Flanzer, 527 F.2d 1288, 1289 (2nd Cir. 1975); and that courts should not be oblivious to this fact, *citing* Williamsburg Wax Museum v. Historic Figures, 501 F.Supp.326, 331 (D.C. 1980). It is clear that such practice would often unfairly deny a litigant the counsel of his choosing, Woods v. Covington City Bank, 537 F.2d 804, 813 (5th Cir. 1976); Board of Ed. of N.Y City v. Nyquist, 590 F.2d 1241, 1246 (2nd Cir. 1979). This explains why the rule of disqualification should not be mechanically applied. Duncaro v. Merryl Lynch, Pierce, Fenner & Smith, 646 F.2d 1020, 1029

(5th Cir. 1981)".

A motion to disqualify is commonly brought when a lawyer has obtained confidential information about an opponent through a previous lawyer-client relationship. A disqualification motion implicates a wide range of interests, including: a client's right to counsel of his choice; the hardship suffered by a party whose lawyer is disqualified; the financial burden of a client to replace disqualified counsel; lawyer's mobility; lawyers' interests in representing particular clients; lawyers' ability to trade on their expertise and to market their practice specialties; the preservation of the attorney-client relationship and client confidences; and the maintenance of the legal profession ethical standards. Thus, given these competing interests, the "mere possibility of a conflict is insufficient to justify disqualification". Reyes Cañada, at 411, *citing* Somascan Plaza at 37; Velez Acevedo at *2. *See also* Combustion Engineering Caribe, Inc. v. George P. Reintjes, 298 F.Supp.2d 215, 219 (D.P.R. 2003). There must be a balance between the client's free choice of counsel and the maintenance of the highest ethical and professional standards. Estrada at 1175, *citing* Government of India v. Cook Industries, Inc., 569 F.2d 737, 739 (2nd Cir. 1978); International Electronics at 1295.

Because motions to disqualify hold great potential for abuse as a litigation tactic, such as delaying the proceedings, imposing extra costs and other burdens on the opponent, and getting rid of counsel who is particular skillful, courts disfavor disqualification motions. *See* Polyagro at 256. *See also ABA/BNA Lawyers' Manual on Professional Conduct,* §§51:1901.10; 51:1901.20.30.[5]  The ethics rules are not "to be employed as arrows in the

---

[5] Such has been the norm in this district court. Motions to disqualify have been **denied** in Ashe v. Distribuidora Norma, Inc., 2012 WL 12995645; Combustion Engineering Caribe, Inc. v. Geo P. Reintjes Co., Inc., 298 F.Supp.2d 215 (2003); Estrada v. Cabrera, 632 F.Supp. 1174 (1986); Hill v. Culebra Conservation and Development Authority, 599 F.Supp.2d 88 (2009); Howe Investment Ltd v. Pérez y Cia. de Puerto Rico, 96 F.Supp.2d 106 (2000); Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc., 903 F.Supp 253 (1995); Reyes-Cañada v. Rey-Hernández, 193 F.Supp.2d 409 (2002); Ríos-Colón v. Toledo, 2012 WL 13170213; Rivera-Molina v. Casa La Roca, Inc., 546 F.Supp.3d 108 (2021); Somascan Plaza, Inc. v. Siemens Medical Systems, Inc., 187 F.R.D. 34 (1999); Southwire Co. v. Ramallo

litigator's quiver, to be loosed from time to time at targets of opportunity as the ebb and flow of an adversarial proceeding may appear to dictate". <u>Schuff v. A.T. Klemens & Son</u>, 16 P.3d 1002, 1016 (Mont. 2000). Disqualifying a party's chosen attorney is a serious matter which may not be supported by the mere possibility of a conflict. <u>Estrada</u> at 1175, *citing* <u>Richmond Hilton Assoc. v. City of Richmond</u>, 690 F.2d 1086, 1089 (4th Cir.1982).

Although the appearance of impropriety standard in disqualification motions was addressed by some courts interpreting Canon 9 of the repealed Model Code of Professional Responsibility, which recognized the appearance of impropriety standard, the Model Rules do not recognize the appearance of impropriety standard for issues regarding conflicts of interests. The *Restatement (Third) of the Law Governing Lawyers,* in Section 121, cmt *c(iv)*, also rejects the use of the appearance of impropriety test for identifying conflicts. *See* <u>Watkins v. Trans Union, LLC</u>, 869 F.3d 514, 520 (7th Cir. 2017) ("Rule 1.9 deleted the lingering reference to 'appearance of impropriety' originally housed in Canon 9 because it was 'no longer helpful to the analysis of questions arising under this Rule'".)

The standard of appearance of impropriety is explicitly rejected for the purposes of former-client conflicts in the Model Rules. *See* Charles Wolfram, *Former-Clients Conflicts,* 10 Geo. J. Legal Ethics 677, 686-687 (1997). Almost every scholarly analysis of the "appearance" standard has disapproved of its use as an independent basis for finding conflict. *See generally* Charles W. Wolfram, *Modern Legal Ethics*, §7.1.4 (noting that the Model Rules avoid the Canon 9 term "appearance of impropriety" because it is too vague a standard of discipline.) Academic commentators and appellate courts have also become critical of the rule. Most recent decisions spurn it as an inappropriate standard if used

---

Bros. Printing, 2009 WL 3429773; <u>Starlight Sugar Inc. v. Soto</u>, 903 F.Supp 262 (1995); <u>Valle-Vega v. Los Magnifikos, Inc.</u>, 2021 WL 5750588; <u>Vélez-Acevedo v. Centro Comprensivo de Cáncer</u>, 2023 WL 6377578. But in

independently and an otiose one if employed conjunctively with more robust tests for former-client conflicts. *E.g., In re* Maritime Aragua, S.A., 847 F.Supp. 1177, 1180 (S.D.N.Y. 1994); United States v. Pacific Constr. Corp., 637 F.Supp. 1556, 1567 (W.D. Wash. 1986); Bergeron v. Mackler, 623 A.2d 489, 494 (Conn. 1993); Wellman v. Willis, 509 N.E.2d 1185, 1190 *(Mass.* 1987).

The moving party holds the burden of proof on a motion to disqualify. Velázquez-Vélez v. Molina-Rodriguez, at 361; Vélez Acevedo at *2. This burden necessarily includes a description of the prior representation. Further, only when the moving party delineates with specificity the subject matters, issues and causes of action presented in the former representation can the district court determine if the substantial relationship test has been met. Somascan Plaza at 39-40, *citing* Duncan v. Merrill Lynch, Pierce, Fenner & Smith, 646 F.2d 1020, 1029 (5ᵗʰ Circ. 1981). A moving party will "fail to meet their burden of proof by presenting allegations without any evidentiary support". Reyes-Cañada at 412, *citing* Somascan Plaza at 39-40.

When analyzing a motion to disqualify certain procedural requirements, including standing and timely filing, must be followed. If these standards are met, courts must balance the competing interests of a client's right to be represented by an attorney of his choice, which is an important one; the hardship that the disqualification will cause to the lawyer's current client; the public interest in the integrity of the legal system; and the possible prejudice to the complaining party if the lawyer remains as counsel on the case. *ABA/BNA Lawyers' Manual on Professional Conduct,* §51.1901.40.30*;* Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc., 903 F.Supp. 253, 256 (D.P.R.1995); Southwire, at *1.

---

Velázquez-Vélez v. Molina-Rodríguez, 235 F.Supp.3d 358 (2017), the motion to disqualify was **granted**.

**V.**

**STANDING TO BRING A MOTION TO DISQUALIFY**

The general rule is that only a former or current client has standing to bring a motion to disqualify counsel on the basis of conflict of interest. *Annotated Model Rules of Professional Conduct,* Tenth Ed., American Bar Association, Center for Professional Ethics, p. 171, *citing* In re Yarn Processing Patent Validity Litig., 530 F.2d 83, 88 (5th Cir. 1976), the case most often cited by courts in standing cases. *See also* Douglas R. Richmond, *The Rude Question of Standing in Attorney Disqualification Disputes,* 25 Am. J. Trial Advoc. 17, 22-23 (Summer 2001), the secondary source most cited in disqualification cases. A court must determine standing before reaching the merits of a disqualification motion. Standing is a jurisdictional component of a party's case because only a party who has standing may invoke a court's jurisdiction.

In Combustion Engineering at 219, this district court stated "[t]hat even though some jurisdictions have sided with Defendant's position [citation omitted], in our jurisdiction non-parties to the attorney-client relationship have been found suitable to alert the court as to possible ethical violations including conflict of interests via motions to disqualify opposing counsel". Advocating for this minority rule in relation to standing to bring conflict of interest issues, the court cited Kevlik, at 848 (a First Circuit case), as controlling law, and also cited Reyes-Cañada, at 411 and Somascan Plaza at 37.

Nevertheless, the court recognized the risk of permitting someone extraneous to the attorney-client relationship to bring a motion to disqualify a lawyer that had not been his counsel. Thus, the court stated: "However, the notion that someone extraneous to an attorney-client relationship raising the specter of a conflict of interest stemming precisely form this

privity and which may result in the removal of counsel of choice raises valid and competing concerns. The risk of this mechanism being used for tactical or strategic purposes by opposing parties in a litigation must be weighed by the court as well as the effect of negating chosen attorney". Combustion Engineering at 219, *citing* Kevlik at 848; Reyes-Cañada at 411; and Somascan Plaza at 37.

However, the precedents cited in Combustion Engineering must be examined with caution.

First, the two cases cited from this district court in Combustion Engineering do not stand for the proposition that a non-party to an attorney-client relationship may bring a motion to disqualify, which is the minority rule.

In Reyes-Cañada the motion to disqualify was brought by defendant, the Department of Education, against plaintiffs' counsel, the Aldarondo Lopez Bras Law Firm. Defendant alleged that Aldarondo Lopez Bras had been previous counsel for the Department of Education in a substantially related matter and that Aldarondo Lopez Bras should be disqualified as plaintiffs' counsel. It seems obvious that the Department of Education was a party - not a non-party - in relation to the previous attorney-client relationship between the Department of Education and Aldarondo Lopez Bras with standing based on the general rule of standing which requires a former client-lawyer relationship to bring a disqualification motion against their former attorney.

Second, in Somascan Plaza the motion to disqualify was brought by Somascan Plaza alleging that they had had a previous attorney-client relationship in a substantially related matter with the McConnel Valdés Law Firm, defendant's counsel. They argued that a conflict of interest existed between McConnel Valdés' former representation of Somascan Plaza and McConnel Valdés' current representation of Siemens. Evidently, Somascan Plaza was a party - not a non-

party- in relation to the previous attorney-client relationship between Somascan Plaza and McConnel Valdés with standing based on the general rule of standing which requires a prior client lawyer relationship to bring a disqualification motion against their former attorney.

Third, Kevlik was a 1984 case of first impression in the First Circuit. The district court had issued an order disqualifying the law firm of Wiggin & Nourie as counsel for defendants, the Town of Derry. The disqualification was based on a violation of professional ethical conduct, "the appearance of professional impropriety", as specified in the Model Code of Professional Conduct, Canon 9.[6] Although Southmayd was not a party in the suit filed by Kevlik against the Town of Derry, Kevlik filed a motion to disqualify defendant's counsel Wiggin & Nourie asserting that one of its lawyers, McNamara, was privy to privileged attorney-client information provided by Southmayd – a non-party – to McNamara. Defendant City of Derry argued that Kevlik lacked standing to pursue McNamara's and Wiggin & Nourie's disqualification because only McNamara's former client- Southmayd - could present a disqualification motion. The First Circuit cited the case of Brown & Williamson Tobacco Corp. v. Daniel International Corp. 563 F.2d 671, 673 (5th Cir. 1977), that held that appellant had standing to seek disqualification even though it was not an aggrieved client because its attorneys were authorized to report any ethical violations in the case. The First Circuit held that Kevlik had standing to seek disqualification of McNamara and Wiggin & Nourie, even though Kevlik was not a former client of McNamara and Wiggin & Nourie. The First Circuit stated that Kevlik had standing because his attorneys were authorized to report any ethical violations in the case based on DR 1-103 (A) of the repealed Model Code of Professional Responsibility which required that an attorney came forward if he

---

[6] The Model Code of Professional Conduct was adopted by the American Bar Association ("ABA") in 1969. The Model Code was amended several times, the last amendments adopted in 1980.  In 1983, the ABA replaced the Model Code with the Model Rules of Professional Conduct, which are the applicable ethics rules in the District of Puerto Rico. *See* Local Civ. R. 83E(a).

had knowledge of an actual or potential violation of a disciplinary rule.

Presently, <u>Kevlik</u> is not a sound precedent. Not only <u>Kevlik</u> is contrary to the general rule of standing to bring a motion to disqualify, but Canon 9 of the Model Code, with its appearance of impropriety standard to solve conflicts of interest, was abandoned with the adoption of the Model Rules. The modern trend was recognized in <u>Teletronics Propriety Ltd. v. Medtronic</u>, 836 F. 2d 1332, 1338 (Fed. Cir. 1988), where the court said that they would "apply the law of the Second Circuit, which like our case law recognizes the trend away from disqualification based solely on an appearance of impropriety".

Not only that, but the duty to report misconduct by any lawyer under replaced DR 1-103(A) of the Model Code was limited to violations of a disciplinary rule; illegal conduct involving moral turpitude; illegal conduct involving dishonesty, fraud, deceit or misrepresentation; conduct prejudicial to the administration of justice; and any other conduct that adversely reflected on a lawyer's duty to practice law. It is evident that DR l-103(A) did not include reporting conflicts of interest. It is also evident that presently Model Rule 8.3(a) only requires that "a lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a <u>substantial question</u> as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate <u>professional authority</u>". (Emphasis added).

It should be noted that reporting under Model Rule 8.3(a) is limited to serious conduct and that, in any case, reporting is limited to informing the lawyer's misconduct to disciplinary authorities and does not include the duty to present motions to disqualify based on conflicts of interest. According to the general rule, motions to disqualify because of conflict of interests are reserved to former or current clients of a lawyer. That rule responds to the fact that conflicts of

interests rules are adopted for the benefit of clients so that a lawyer will remain loyal to his client while preserving his confidences. Absent the attorney-client relationship, an attorney's duties of confidentiality and loyalty do not arise.

Finally, violation of an ethics rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Model Rules are designed to provide guidance to lawyers and their purpose can be subverted when they are invoked by opposing parties as procedural weapons. *See* Richmond, at 48-49. The purpose of the disqualification rule under Model Rule 1.9 is to prevent confidential information from a prior representation, from being used for the benefit of another client who is now the adversary of the prior client. Rivera-Molina at 111, *citing* Reyes-Cañada at 411**.** The Model Rules dealing with conflicts of interest are chiefly concerned with protecting the client's confidential disclosures to the attorney and ensuring the attorney's loyalty to the client's interest. Valle-Vega at *2.

Under the facts of the **Ghaffar-Paulson Litigation**, as there is no prior or current attorney-client relationship between **Andréu and Umpierre** and any of the three **Paulson Defendants**, as will be addressed next, none of the **Paulson Defendants** have standing to bring a motion to disqualify **Andréu and Umpierre**.

## VI.

## THE IDENTITY OF THE CLIENT

Pursuant to Model Rule l.13(a), when a lawyer represents an organization, he does not, without more, also represents individual constituents or affiliates. Although the entity can act only through its duly authorized constituents, such as directors and officers, the organization's lawyer owes his professional duties to the entity itself, rather than its owners.

This is the "entity theory" of representation. *ABA/BNA Lawyers' Manual on Professional Conduct,* §91:2001.10.

The entity theory has come to be universally accepted in U.S. law for purpose of determining the identity of the client when a lawyer represents a corporation or other organization. *Restatement (Third) of the Law Governing Lawyers,* §96(l)(a). Under the entity theory, the lawyer for a corporation or other organization owes his ethical and professional obligations to his client - the organization- and not to the organization's constituents.

In the context of current client conflicts, Comment [34] to Model Rule 1.7 states that a lawyer who represents an organization does not necessarily represent any affiliated organization. ABA Formal Ethics Op. 95-390 (1995), advised that corporate affiliation, without more, does not make the affiliate a corporate co-client for purposes of conflicts of interest. The Restatement is in accord and indicates that typically only the corporation that retains the lawyer is the lawyer's client and that affiliated corporations are not thereby considered to be the lawyer's client. *Restatement (Third) of the Law Governing Lawyers,* §121, cmt *d.*

The fact that a company is a close corporation or similar form of small business does not in itself necessitate a retreat from the rule that the entity is the client. The same is true concerning large companies, the lawyer for a small business does not automatically represent the shareholders, members, officers or other constituents. *ABA/BNA Lawyers' Manual on Professional Conduct,* §91:2001.20.150.

In the first instance referred to in the *Motion to Disqualify* that supposedly presents a conflict of interest to **Andréu**, the **Paulson Defendants** allege that **Andréu** represented **Duo Condado** between November 2020 and February 2021. **Duo Condado** is a Limited Liability

Company to which **Andréu** provided consultant services as to the negotiation of two rental/lease agreements with two party vendors. **Duo Condado** is considered an entity under Model Rule l.13(a) and the fact that **Andréu** represented such entity does not mean, without more, that he also represented individual constituents or affiliates of such entity. **Duo Condado** is not a defendant in the **Ghaffar- Paulson Litigation** and has no standing to present a motion for the disqualification of **Andréu**. Not only is **Duo Condado** not a defendant in the **Ghaffar-Paulson Litigation**, but just by having represented **Duo Condado** in the mentioned lease negotiations, neither **Paulson, PRV** or the **Family Trust,** the **Paulson Defendants**, became **Andréu's** clients with standing to seek his disqualification. The fact that **PRV** may be the owner of **Duo Condado** has no significance to the standing question because both **Duo Condado** and **PRV** are separate and distinct entities.

In the second instance referred to in the Motion to Disqualify that supposedly presents a conflict of interest to **Andréu,** the **Paulson Defendants** allege that **Andréu** represented **F40**. But **F40** is not a defendant in the **Ghaffar-Paulson Litigation** and, thus, has no standing to seek **Andréu's** disqualification. In addition, **PRV** is not **Andréu's** former, or current client and only former or current clients of a lawyer may seek his disqualification. The fact that **PRV** is the owner of **F40** and that **Andréu** formerly represented **F40** does not convert **PRV** in **Andréu's** client under the entity theory.

In the third instance referred to in the *Motion to Disqualify* that supposedly presents a conflict of interest to **Andréu and Umpierre**, the **Paulson Defendants** allege that **Andréu and Umpierre** are concurrently representing **Ghaffar** and **IHR** in the **Díaz-Pagán Litigation**. Notwithstanding that in the **Díaz-Pagán Litigation**, **Ghaffar** and **IHR** have no conflicting claims or defenses, for the two of them are aligned as co-defendants in such litigation, the

allegation is a gross misrepresentation and a factual error. As to the **Ghaffar-Paulson Litigation**, **IHR** is not a party and has no standing to seek **Andréu's and Umpierre's** disqualification, in addition to the fact that **IHR** is not a former nor a current client of neither of those attorneys.

## VII.

## ATTORNEY-CLIENT RELATIONSHIP

The existence of an attorney-client relationship is a question of fact. *See* Comment [2] to Model Rule 1.9. In order to determine whether a particular situation warrants disqualification, the court need to ascertain whether a previous attorney-client relationship exists, and if so, whether the prior and the present representations are substantially related. Howe Investment, Ltd. v. Perez y Cia. De Puerto Rico, Inc., 96 F. Supp. 2d 106, 109 (D.P.R. 2000), *citing* Polyagro Plastics at 256. In doing so, the court must balance two competing interests: (1) the right of a party to an attorney of his choice; and (2) the protection of the integrity of the judicial process. *Id.*

As to the first step, the attorney-client relationship may be explicit or implicit. A party does not need to produce a formal contract or fee payment to establish an attorney-client relationship. Howe at 110, *citing* Polyagro at 256 who *cited* Westinghouse Elec. Corp. v. Kerr-McGee, 580 F.2d 1311, 1319 (7th Cir. 1978). If there was an attorney-client relationship, the Court must determine whether there is a substantial relationship between the lawyer's former representation and the lawyer's current representation. Polyagro at 256.

When the attorney-client relationship is explicit, the court must assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. Howe Investment at 110, *quoting* Kevlik at 850. However, when the former relationship is an implied one, such presumption does not follow, and the court must inquire into the substance of the information that passed between the party and the attorney.

Howe Investment at 110, *citing* Polyagro at 257, who *cited* Westinghouse at 1319. Thus, in an implied relationship, the existence of confidential information must be proved rather than assumed, as is the case of explicit relationships. Polyagro at 257, 258.

The definition of confidential information for the purposes of a disqualification motion is information that if revealed could put a party at a disadvantage or the other party at an advantage. Polyagro at 258. But the mere allegation that confidential information was exchanged in a prior representation will not suffice to demonstrate that confidences were shared, Howe Investment at 111, *quoting* Starlight at 266. In Howe Investment some of the confidential information allegedly disclosed to the attorney was of general and vague nature and, therefore, insufficient to warrant disqualification, and some simply did not constitute the requisite confidential information needed to create an implied attorney-client relationship between attorney and client. Howe Investment at 111**,** *citing* Polyagro at 258.

In Howe Investment the court was explicit stating that a valuation and financial analysis of the property involved in the litigation could have been obtained through independent means and that the fact that it may have been performed by the lawyer's client was of no consequence. Howe Investment at 111-112. As to the assertion that the client disclosed to the attorney the client's internal evaluation of its own financial status, the court noted that such information could have been obtained from the Commonwealth of Puerto Rico Department of State, where all corporations organized and existing under the laws of the Commonwealth must file their annual financial statements. The officer's allegation that he disclosed information about strategic and business considerations that were important to the client in negotiating a lease said nothing about the substance of such information. The court considered that such information was insufficient to create an implied attorney-client relationship between lawyer and client and thus, there was no

need to disqualify the attorney. <u>Howe Investment</u> at 112.

In <u>Borges v. Our Lady of the Sea Corp.,</u> 935 F.2d 436,439 (1st Cir. 1991), the First Circuit concluded that the lawyer did not receive confidential information from a prior suit but from his own client who was one third owner of defendant's corporation and its treasurer and had all the corporate information he needed for the personal injury case at his fingertips. <u>Polyagro</u> at 440.

Under the facts alleged in the **Ghaffar-Paulson Litigation**, **Andréu and Umpierre** did not form an attorney-client relationship, expressed or implied, with any of the three **Paulson Defendants**. As no attorney-client relationship between **Andréu and Umpierre** and any of the **Paulson Defendants** has been formed, there is no need to disqualify **Andréu and Umpierre** as **Ghaffar's** legal representation.

## VIII.

### SUBSTANTIALLY RELATED TEST

The substantial relationship analysis was first utilized by Judge Weinfield in <u>T.C. Theater Corp. v. Warner Bros. Pictures,</u> 113 F.Supp. 265, 268 (S.D.N.Y. 1953); <u>Estrada</u> at 1176. The Model Rules subsequently incorporated the "substantially related" language into Rule 1.9.

In Borges at 439, the First Circuit reaffirmed that the "substantially related" test governs the inquiry into whether disqualification is appropriate in attorney conflict of interest cases, <u>Rivera-Molina v. Casa LaRoca, Inc.,</u> 546 F. Supp. 3d 108, 110 (D.P.R. 2021).

As stated in <u>Rivera-Molina,</u> the test to determine whether matters are "substantially related" consists of three steps of inquiry. "First, the court reconstructs the scope of the facts involved in the former representation and projects the scope of the facts that will be involved in the second representation. Second, the court assumes that the lawyer obtained confidential client

information about all facts within the scope of the former representation. Third, the court determines whether any aspect of the former representation is so similar to any material matter in the latter representation that a lawyer would consider it useful in advancing the interest of the client in the latter representation." Rivera-Molina at 111-112, *citing* Starlight at 265-266.

Prior to engaging in its substantial relationship analysis, a Court must know at least the substance of and issues involved in the prior representation. Plaintiff's conclusory allegations regarding the sharing of confidences, without a description of the representation, are not enough to support the burden, since "the mere allegation that confidential information was exchanged in a prior representation will not suffice to create the 'irrebuttable presumption' of shared confidences that is so frequently spoken of in this area of the law." Somascan at 40, *citing* Starlight at 266.

Naked claims that the attorney received confidential information from his prior (and now adverse) client do not suffice. Rather, "the moving party must allege the type and nature of the confidences that were exchanged in the prior litigation that should subsequently disqualify the attorney in the latter representation". Velázquez Vélez at 362.

Next, the Court must project the scope of the current litigation to determine whether any aspect is so similar to a material matter in the current litigation that it would be useful in advancing the former client's position. Merely pointing to a superficial resemblance between the present and prior representations will not substitute for careful consideration. Somascan at 41. The information learned by the lawyer in the former representation may have little relevance to the specific claims in the lawyer's present case so that the scope of the lawyer's prior representation may be far removed from this narrow inquiry. Somascan at 41.

Knowledge of a former client's financial and business background is not in itself a basis for disqualification if the client's background is not an issue in the later litigation. Somascan at 41, *citing* United States Football League v. National Football League, 605 F.Supp. 1448 (S.DN.Y. 1985). In Somascan, the court held that the prior representation of Somascan Inc. in the 1980's related to filing a tax exemption was not substantially related to Somascan Inc.'s claims in a case of a retaliatory disconnecting of medical equipment. Somascan at 41. The court could not assume that any information about Somascan Inc.'s business or financial background will be an issue in the instant case. *Id*.

Although a former client is not required to reveal the confidential information learned by the lawyer in order to establish a substantial risk that the lawyer has confidential information to use in the subsequent matter, a "conclusion about the possession of such information may be based on the nature of services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services". Velázquez Vélez at 362, *quoting* Commentary [3] to Model Rule 1.9.

The factual reconstruction and basic test in considering a motion to disqualify is "whether it could reasonably be said that during the former representation, the attorney might have acquired information related to the subject matter of the subsequent representation". Estrada, at 1176, *citing* La Salle National Bank v. County of Lake, 703 F. 2d 252, 255 (7th Cir. 1983).

Considering the allegations in the **Motion to Disqualify** in the **Ghaffar- Paulson Litigation** and **Andréu's** former representations, there is no substantial relationship between **Andréu's** previous representations and the current representation of **Ghaffar** in the **Paulson-Ghaffar Litigation**. The prior representation of **Duo Condado** was limited to counseling in the negotiation of two rental/lease agreements. On the other hand, **Andréu's** former representation

of **F40** was in a breach of contract case related to the purchase of a Ferrari car. Neither previous representation is substantially related in any way to the **Ghaffar-Paulson Litigation**. In the **Diaz Pagán Litigation**, **Andréu and Umpierre** are currently representing **Ghaffar** but are not counsel for any other co-defendant. But in any event, the **Díaz Pagán Litigation**, concerning a wrongful termination and a defamation action, does not have any substantial relationship with the **Ghaffar-Paulson Litigation** either.

The scope of the **Ghaffar- Paulson Litigation** relates to the negotiation of a Convertible Note that was supposed to be executed by **PRV**. Without a substantial relationship between **Andréu's** former representations of **Duo Condado** and **F40**, and **Andréu and Umpierre** current representation of **Ghaffar** in the **Díaz-Pagán Litigation**, there is no way that **Andréu and Umpierre** may have obtained confidential information in the former representations, or the current representation of **Ghaffar,** that may be relevant to the **Ghaffar-Paulson Litigation,** thus causing a disadvantage to the **Paulson Defendants,** or an advantage to **Ghaffar.** Representation of a now adverse party to the lawyer's former client is not *per se* improper without a showing that the matters in the pending suit are substantially related to the matters in which the attorney previously represented the party. Estrada at 117, *citing* Waterbury Garment Corp. v. Strata Production, 554 F.Supp. 63, 66 (S.D.N.Y. 1982).

## IX.

## COMMONALITY OF INTERESTS

When there are other co-defendants separately represented by different counsel, they may decide to cooperate with each other because their interests are aligned. Even though a lawyer becomes privy to confidences discussed by other members or lawyers in this arrangement, called joint defense agreements or consortium agreements, each lawyer is representing his own client

and does not form a client-lawyer relationship with the other co-defendants involved in the joint agreement. Ronald D. Rotunda & John S. Dzienkowski, *Legal Ethics, The Lawyer's Deskbook on Professional Responsibility*, American Bar Association, Center for Professional Responsibility, §1.6-6 (2021-2022).  This arrangement allows that persons who have common interests may coordinate their positions without destroying the privileged status of their communications with their own lawyers. *Restatement (Third) of the Law Governing Lawyers*, §76, cmt. *b*. Exchanging communication among co-defendants may be predicated on an express agreement, but formality is not required. *Id*., cmt. *c*.

The **Paulson Defendants** allege that because of the agreement among co-defendants for their defense in the **Diaz-Pagán Litigation, Andréu and Umpierre** have become legal counsel to **IHR**, thus obtaining confidential and sensitive information not otherwise available to the general public. They point out that the close collaboration among lawyers for the co-defendants **Ghaffar** and **IHR**, has entailed constant exchange of e-mails, drafts of court pleadings and written discovery concerning the **Paulson Defendants** and La Concha and Vandebilt Hotels. However, based on the applicable substantive law, such allegations are against sound legal principles regarding the entity theory, the formation of the client-lawyer relationship and the common defense doctrine and, thus, are completely meritless.

## X.

## CONCLUSION

Based on the above discussion, the **Paulson Defendants** Motion to Disqualify is meritless for the following reasons:

1.      The **Paulson Defendants** have no standing to move for the disqualification of **Andréu or Umpierre**.

2.      The general rule is that only a litigant with standing may move to disqualify a lawyer. Standing – which is a jurisdictional question – requires that only a former or current client of a lawyer may move for his disqualification and none of the **Paulson Defendants** have ever been **Andréu's or Umpierre's** clients.

3.      The **Paulson Defendants** try to bypass the entity theory which stands for the proposition that an organization like a corporation, a limited liability company or any other form of legal organization is an entity separate from its constituents or affiliates. All the entities that form the conglomerate **Paulson & Co.** in the form of limited liability companies or regular business corporations are individual entities, even though they may be components of a conglomerate of related entities under **Paulson's** ownership.

4.      Under the entity theory, the fact that **Andréu** may have represented an entity that is part of the **Paulson & Co.** conglomerate does not equate to representation by **Andréu** of any other entity forming part of the **Paulson** conglomerate. Thus, **Andréu's** former representation of **Duo Condado** and **F40**, two limited liabilities companies that are part of the **Paulson** conglomerate, does not imply that **Andréu** was also legal counsel to any other **Paulson** entity. The fact that **PRV** – a **Paulson** entity – is the owner or Managing Partner of either or both **Duo Condado** and **F40** – which are not entities included as part of the **Paulson Defendants** – is not sufficient to form a client-lawyer relationship between **Andréu** and **PRV**, an entity that was included as one of the **Paulson Defendants**.

5.      Under the farfetched assumption that there may be a client-lawyer relationship between **Andréu or Umpierre** and any of the **Paulson Defendants**, the question of standing should not be addressed under the <u>Kevlik</u> decision that applied the minority rule that does not require standing to bring a motion to disqualify. Such opinion was based on the now repealed

Model Code of Professional Responsibility that included the "appearance of impropriety" as a standard for analyzing disqualification motions. The "appearance of impropriety" standard is not recognized nor included in the Model Rules of Professional Conduct and is a standard for analyzing conflicts of interests that has been much criticized by scholars and legal commentators. The First Circuit case also relied on a duty to report any unethical conduct that was required by the Model Code but a similar duty was not incorporated in the Model Rules. Under the Local Rules of the District Court of Puerto Rico, the Model Rules are the substantive law to be applied in analyzing disqualification motions.

6.      The alleged three instances of **Andréu's** conflicts of interest are meritless [including the one involving Umpierre]. As to the first two, the fact that **Andréu** represented **Duo Condado** and **F40** is not enough to claim a conflict of interest in the **Ghaffar Paulson Litigation**. Both former representations must be substantially related to the issues presented in the **Ghaffar Paulson Litigation**, which they are not. It is clear that **Andréu's** representation of **Duo Condado** was limited to counseling during the negotiation of certain lease and rental agreements in relation to reopening a restaurant in one of the hotels properties of **Duo Condado**. The **F40** representation pertained to an alleged breach of contract in relation to the sale of a Ferrari car. The **Ghaffar Paulson Litigation** does not involve any lease or rental contract related to a restaurant, nor the sale of a car. The **Ghaffar Paulson Litigation** is limited to the execution of a Convertible Note as *quid pro quo* of a $17 million investment by **Ghaffar**. Conclusory and general allegations about **Andréu's** supposed acquired knowledge of confidential and sensitive information during the former representations that may cause an advantage to **Ghaffar** or a disadvantage to the **Paulson Defendants** requires a monumental leap in legal reasoning. There is no substantial relationship between **Andréu's** former representations of **Duo Condado** and **F40**

and the current representation of **Ghaffar**.

7.      The allegation that **Andréu and Umpierre** have a current conflict of interests because in the **Diaz Pagán Litigation** they are representing **Ghaffar** as well as an entity that form part of the **Paulson** conglomerate is completely baseless. That entity (**IHR**), as well as **Ghaffar**, are aligned as co-defendants in the **Diaz Pagán Litigation**. Each one has its own counsel and the fact that, being aligned as co-defendants, they may share information to establish a common or joint defense is not sufficient to conclude that each lawyer has become legal counsel to all other co-defendants. In addition, the **Díaz Pagán Litigation,** pertaining to an alleged wrongful termination of employment and defamation, is not related in any way with the **Ghaffar-Paulson Litigation**.

RESPECTFULLY SUBMITTED, in San Juan, P.R., this 30th day of November, 2023.

IT IS HEREBY CERTIFIED that, on this same date, the foregoing document has been electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*s/ JOSÉ A. ANDRÉU-FUENTES*
JOSÉ A. ANDRÉU-FUENTES
USDC-PR 204409
jaf@andréu-sagardia.com


*s/ ALFREDO UMPIERRE-SOLER*
ALFREDO UMPIERRE-SOLER
USDC-PR226205
aumpierresoler@gmail.com

261 Domenech Avenue
San Juan, PR 00918
Phone (787) 754-1777 / (787) 763-8044
Fax (787) 763-8045