IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

FAHAD GHAFFAR,

Plaintiff,

v.                                                   CIVIL NO. 23-1455 (CVR)

JOHN PAULSON, et al.,

Defendants.

**OPINION AND ORDER**

**INTRODUCTION**

The present case arises from an investment made by Plaintiff Fahad Ghaffar ("Plaintiff") in companies owed by co-Defendant John Paulson ("Paulson") in which he claims he invested approximately $17,000,0000.00 into a note issued by co-Defendant Paulson PRV Holdings, LLC ("PRV" collectively the "Paulson Defendants"), which would initially pay profits and interest, and would later be converted into a fifty percent (50%) equity interest. Plaintiff proffers Paulson misrepresented the transaction at issue, failed to pay him in over sixteen (16) months, and never produced the note. Co-Defendant J.P. Morgan Trust Company of Delaware ("J.P. Morgan") is the trustee of the Paulson 2009 Family Trust (the "2009 Trust"), that owns PRV (collectively "Defendants").

Plaintiff brings forth unjust enrichment and breach of contract claims pursuant to Puerto Rico law against co-Defendants PRV and the 2009 Trust. Plaintiff also brings forth a claim for securities fraud against all Defendants in violation of the Securities Exchange Act of 1983;[1] a "dolo"/fraud claim pursuant to Article 1168 of the Puerto Rico

---

[1] 15 U.S.C. 78(j)(b) and 17 C.F.R. 240.10b-5.

Civil Code of 2020[2]; a claim for violations to the Puerto Rico Uniform Securities Act ("PRUSA"),[3] and seeks damages for bad faith under Article 18 of the Puerto Rico Civil Code of 2020.[4]  Plaintiff additionally asks the Court for a constructive trust to hold the monies received by Defendants that Plaintiff avers he is entitled to.

Before the Court is the Paulson Defendants' "Memorandum of Law in Support of their Motion Dismiss the Amended Complaint and Stay All Proceedings", in which they contend that the Amended Complaint must be dismissed in its entirety, as Plaintiff has failed to state a claim on all counts.  They additionally ask the Court to stay discovery pursuant to 15 U.S.C. § 78u-4(b)(3)(B).  (Docket No. 28).

Plaintiff opposes arguing that, accepting as true the allegations made in the Amended Complaint, he has properly pled all causes of action.  (Docket No. 59).

The Paulson Defendants filed a Reply (Docket No. 79), and Plaintiff's filed a Sur-Reply. (Docket No. 113).

For the reasons explained below, the Court hereby GRANTS IN PART and DENIES IN PART the Paulson Defendants' Motion to Dismiss.

## STANDARD

Federal Rule of Civil Procedure 8(a) requires plaintiffs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A "short and plain" statement needs only enough detail to provide a defendant with "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 1965 (2007); see also Erickson v.

---

[2] P.R. Laws Ann. tit. 31, § 9332 (2020).
[3] P.R. Laws Ann. tit. 10, § 851, *et seq.*,
[4] P.R. Laws Ann. tit. 31, § 5337 (2020).

Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement . . .' Specific facts are not necessary."). To "show" an entitlement to relief, a complaint must contain enough factual material "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." See Twombly, 550 U.S. at 555, 127 S.Ct. 1955.

When addressing a motion to dismiss under Rule 12, the court must "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiffs." Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). Under Twombly, however, a plaintiff must "provide the grounds of his entitlement [with] more than labels and conclusions." Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). A plaintiff is now required to present allegations that "nudge [his] claims across the line from conceivable to plausible" to comply with the requirements of Rule 8(a). Twombly, 550 U.S. at 570, 127 S.Ct. at 1974; see also Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937 (2009).

In turn, Rule 9 of the Federal Rules of Civil Procedure requires that complaints of fraud or mistake be pled "with particularity." Fed. R. Civ. P. 9(b). Rule 9 was applied to securities fraud claims until 1995, when the Private Securities Litigation Reform Act of 1995, codified at 15 U.S.C. § 78u-4 (1995), amended the Securities Exchange Act of 1934 and further incorporated the heightened pleading standard in securities fraud cases into said law. A complaint alleging federal securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and

belief, the complaint shall state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  Thus, Plaintiff's fraud claims must have been pled with sufficient specificity to overcome the Paulson Defendants' petition to dismiss.

### STATEMENT OF FACTS[5]

The Court accepts Plaintiff's allegations as true for purposes of the Motion to Dismiss.  Ponsa-Rabell v. Santander Sec., LLC, 35 F.4th 26, 30 (1st Cir. 2022); O'Brien v. Deutsche Bank Nat'l Tr. Co., 948 F.3d 31, 35 (1st Cir. 2020).

Co-Defendant Paulson is a well-known businessman.  Co-Defendant PRV was formed so co-Defendant Paulson could conduct business in Puerto Rico.  Paulson is the Managing Member of co-Defendant PRV, which in turn, is owned by the 2009 Trust.  Co-Defendant J.P Morgan is the trustee of the 2009 Trust.

Non-party F40, LLC ("F40") is a Puerto Rico limited liability company which sells high-end luxury automobiles in exclusive dealerships in Puerto Rico.  Non-party V12 Land, LLC ("V12") is a Puerto Rico limited liability company created to hold the land on which F40 operates.  Both F40 and V12 are owned by Co-Defendant PRV.  PRV was the holder of all F40 and V12 membership interests when the transaction object of this case took place.

Plaintiff and co-Defendant Paulson have worked together and co-invested since 2013.  In February 2022, PRV purchased 100% of the assets of Gómez Hermanos Kennedy for approximately $103,000,000.00 and transferred those assets and operations to F40 and V12.  Paulson asked Plaintiff to invest in F40 and V12 through an automatically

---

[5] All facts are derived from the Amended Complaint.  (Docket No. 14).

converting note (the "Note").   In exchange for Plaintiff's investment, he would receive a fifty percent (50%) membership interest in V12 and the Note.  The Note's terms were as follows: Plaintiff would receive a ten percent (10%) of F40's net profits annually for his service to the company[6] and a profits interest amounting to fifty percent (50%) of the annual profits remaining after the ten percent (10%) was deducted.  This equation would operate until F40 obtained approval from the auto manufacturers, when Plaintiff's profit interest would automatically convert to a fifty percent (50%) membership interest in F40, and he would receive fifty percent (50%) of the distributed profits.[7]

Plaintiff proffers that, relying on this agreement, in February 2022, he wired the sum of $16,705,000.00 to a Paulson account, which was then transferred to co-Defendant PRV.  Plaintiff repeatedly inquired about the documentation evidencing his purchase of the Note, which was never provided.  Instead, the Paulson Defendants continually made misrepresentations that the document was forthcoming, stringing him along for over a year.

In June 2022, a Paulson attorney sent Plaintiff an email which confirmed the basic terms of the deal, but with a different Paulson entity, PCI Delaware LLC, indicating that "the proposed structure contemplates that Better Puerto Rico LLC will initially hold a convertible note with PCI Delaware LLC."[8]  The parties exchanged further emails and drafts of the Note, but a final version of the Note was not furnished.  For over a year, the Paulson Defendants continued to string Plaintiff along as to the business transaction, but

---

[6] Plaintiff was appointed President and CEO of F40 after the investment of the Note.
[7] The Amended Complaint states that auto manufacturers require information on the equity structure and owners of the purchasing entity and must approve any changes in ownership, thus explaining the delay.
[8] Docket No. 1, ¶ 25.

never produced a final, signed document or paid him.

After the money was wired, Plaintiff ran F40 as its President and CEO without receiving any type of payment for over one (1) year, until August 18, 2023, when he was dismissed by Co-Defendant Paulson from his positions with F40.  During this time, Plaintiff managed to double F40's profits, and would not have done so were it not for his investment in the Note.  Plaintiff again demanded evidence of the Note, which was never provided.

Then, on September 9, 2023, Plaintiff filed the present case.  A few days later, on or about September 16, 2023, Plaintiff received a Schedule K-1 document indicating his company, Better Puerto Rico LLC owned fifty percent (50%) of V12.  He also received a different Schedule K-1, showing an approximate three percent (3%) interest in an entity called Paulson Management IV LLC (a different 2009 Trust-owned entity), which was never part of the agreement between Plaintiff and co-Defendant Paulson.

As a result of the Paulson Defendants' failure to deliver the Note and fraudulent conduct, Plaintiff never received any of the agreed-upon benefits of his bargain, resulting in a loss of the value of the investment and well as his investment funds.

## LEGAL ANALYSIS

### A. Federal Securities Fraud.

Section 10(b) of the Securities Exchange Act forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b).  Commission 10b-5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact

"necessary in order to make the statements made . . .  not misleading." 17 CFR § 240.10b–5 (2004).

A securities fraud claim must plead the following six (6) elements: (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  In re: Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017); Dura Pharma., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 1631 (2005).

The Paulson Defendants aver that Plaintiff failed to adequately plead five (5) out of these six (6) elements.

1.   Material misrepresentation or omission.

"To survive a motion to dismiss under the securities law, a complaint must adequately plead statements [or omissions] that were 'misleading as to a material fact.'" Thant v. Karyopharm Therapeutics Inc., 43 F.4th 214, 222 (1st Cir. 2022) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38, 131 S.Ct. 1309, 1317 (2011)).  The Paulson Defendants claim that the sole "misrepresentation" alleged in the Amended Complaint is that they would, at some unspecified time, deliver the Note to Plaintiff.  They proffer this is not actionable, insofar as they delivered the Note, but Plaintiff rejected it, asking instead for changes to its terms.  Second, they argue that, even if they had failed to deliver the Note, the alleged misrepresentations were merely statements of future intent and lack specificity as to when they were required to perform and are likewise not actionable.

Plaintiff counters arguing he wired the money and instead of receiving the promised Note, together with the accompanying equity and profit interest in F40, his

funds were misappropriated and diverted into an entity which he did not invest in, and he was never paid anything.  Instead, the Paulson Defendants kept changing the terms of the Note (such as the interest rate and the entity to be invested in) and never delivered the Note and its corresponding payments.

A cursory review of the Amended Complaint shows that Plaintiff alleges that, in exchange for his investment, Plaintiff was to receive the Note incorporating the agreed upon terms as represented by co-Defendant Paulson.  The Amended Complaint further demonstrates that on June 22, 2022, over four (4) months later, the Paulson Defendants delivered to Plaintiff a non-compliant document.  The draft Note, that was sent on June 22, 2022, failed to reflect the agreement's most basic terms, to wit, it did not include the profit interest and it would now be held by an entirely new company, PCI Delaware LLC, instead of the agreed-upon F40.   Several e-mails were exchanged regarding the agreement, but a final Note was never produced.

On these facts, the Court cannot find that the Note was "delivered" as alleged by the Paulson Defendants.  What the Paulson Defendants sent was a draft version of a document which differed from the terms originally agreed upon by the parties.  This begs the question of where Plaintiff's investment went for those five (5) months if the document memorializing the agreement had not yet been formally drawn up and the company the funds were to be invested into had changed.  It was only after the present case was filed that documents evidencing the investment were finally given to Plaintiff.  Even then, one of the documents eventually provided to Plaintiff reflected the investment in a third company, Paulson Management IV, LLC, and not F40 as agreed upon.

While the Paulson Defendants are correct in stating that the Note did not mention

a time frame, as candidly argued by Plaintiff, the Paulson Defendants would have the Court believe that Plaintiff, a seasoned businessman, invested almost $17,000,000.00 without any expectation as to the timing to receive the Note and the agreed upon benefits from that investment. That interpretation of the facts in this case is simply untenable.

The Amended Complaint also alleges that over nineteen (19) months passed after Plaintiff wired the funds, during which the Paulson Defendants used the funds and never produced the final document, always indicating that the document was "forthcoming" and that this was known by the Paulson Defendants to be false when these statements were made. The Amended Complaint also states that they never paid Plaintiff the interest or the salary pursuant to the agreed upon terms of the Note, further evidencing that they never intended to complete the bargain.

The Court finds that these statements were pled with sufficient specificity that, if taken as true and viewed as a whole, in the light most favorable to Plaintiff, constitute material misrepresentations for the purpose of withstanding a 12(b)(6) motion. See Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) ("Plausible allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out or knowing they could not be carried out, and that they were not carried out, are sufficient . . . to state a claim for relief under Section 10(b)").

2. Scienter.

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud," and a plaintiff must allege that "defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002); Ezra Charitable Tr. v. Tyco Int'l, Ltd., 466 F.3d 1, 6 (1st Cir. 2006).

The First Circuit has interpreted the scienter provision "as demanding a recitation of facts supporting a 'highly likely' inference that the defendant acted with the required state of mind." In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 195 (1st Cir. 2005). In making this assessment, "we have eschewed any reliance on a rigid pleading formula, instead "preferring to rely on a 'fact-specific approach' that proceeds case by case." In re Cabletron Sys., Inc., 311 F.3d 11, 38 (1st Cir. 2002); Ezra Charitable Tr., 466 F.3d at 6.

In determining whether an inference of scienter is strong enough to withstand a motion to dismiss, a court is called on to conduct a comparative evaluation that weighs the "inferences urged by the plaintiff" against "competing inferences rationally drawn from the facts alleged." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314, 127 S.Ct. 2499, 2504 (2007). The Court must view a plaintiff's claims in their entirety rather than examining the individual claims in isolation and conclude whether a reasonable person would deem an inference of scienter as "cogent and at least as compelling as any opposing inference" of nonfraudulent intent. Id., at 324, 2510. "In other words, where there are equally strong inferences for and against scienter, Tellabs now awards the draw to the plaintiff." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008).

The Paulson Defendants' position is that Plaintiff admitted he received some correct tax documents, and at a minimum, a draft note (which they allege he rejected but nevertheless received). They also expressed their intent to circulate another draft "for consideration" mere days before Plaintiff filed the present case and argue no inference of scienter can be drawn from these facts. The Court disagrees.

Examining the facts of the Amended Complaint as a whole, and the inferences the Court must make in Plaintiff's favor at this juncture, it clearly states that nineteen (19)

months after the Paulson Defendants received Plaintiff's $17,000,000.00 investment, they had still not provided a final, signed document and were circulating drafts for Plaintiff's consideration.  The inordinate amount of time that elapsed after the wiring of the money alone casts doubt on their motives.  The terms of the Note, although a "unique agreement" as admitted by Plaintiff, were nevertheless a relatively simple deal that should not have taken a seasoned businessman like co-Defendant Paulson months on end to draft and produce.

Although the Paulson Defendants proffer that Plaintiff had "no legitimate reason" not to approve the Note as drafted in June 2022, there was indeed a legitimate reason not to sign it, mainly that it did not reflect the agreed upon terms.  The document sent at that time consisted of four (4) pages, which the Paulson Defendants could have easily and quickly amended to reflect the correct terms of the agreement.  Furthermore, the original agreement was to provide Plaintiff with a fifty percent (50%) share of the profits and an equity interest in F40 as well.  What was ultimately delivered only happened *after* Plaintiff was dismissed from his employment with Paulson, *after* the filing of the present case, and was instead a three percent (3%) interest in a totally different Paulson entity.

As argued by Plaintiff, the only inference to be drawn from these facts at this stage is that the Paulson Defendants did not intend to comply with the original bargain from the beginning, and knowingly misrepresented the terms of the transaction to minimize Plaintiff's equity interest and ultimately, not pay him pursuant to the terms of the agreement. These are the facts as stated in the Amended Complaint which the Court must accept as true at this juncture.  Analyzed as a whole, the allegations in the Amended Complaint are sufficient to clear the scienter hurdle.  See Tellabs, 551 U.S. at 322-23, 127

S.Ct. at 2509 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter . . ."). The Paulson Defendants will be free to explain their own version of these events at the summary judgment stage or during the trial.

On the facts as alleged, the Court concludes that scienter was adequately pled to survive the motion to dismiss.

3.  <u>Connection with the purchase or sale of a security.</u>

The crux of the parties' arguments centers around this element, namely, whether the Note in question is a "security" under the federal securities laws. The Paulson Defendants argue that pursuant to the case of <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 66 S.Ct. 1100 (1947), the Note is not a security. Their position is that for purposes of the federal securities laws, the test under <u>Howey</u> is whether "the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." <u>Id.</u>, at 301, 1104. They claim the Note in the present case is not a security because it involves a "unique agreement" individually negotiated by the parties and not publicly traded, coupled with the fact that the profits associated with the Note derived substantially from Plaintiff's own efforts, not third parties.

In turn, Plaintiff posits that the Paulson Defendants' reliance on <u>Howey</u> is directly contrary to the case of <u>Reves v. Ernst & Young</u>, 494 U.S. 56, 110 S.Ct. 945 (1990) where the Supreme Court rejected applying the <u>Howey</u> elements in favor of the "family resemblance" test. Plaintiff argues that the issue in <u>Howey</u> was whether the contracts there could be considered "investment contracts" under the federal securities laws, and did not entail notes, as in the present case. Plaintiff contends that the <u>Reves</u> case, on the other hand, is directly applicable to notes and is therefore controlling. Plaintiff asserts

the Paulson Defendants have waived this argument because they failed to rebut the presumption that the Note is a security as mandated by <u>Reves</u>.

In <u>Reves</u>, the Supreme Court was tasked with determining whether certain demand notes were "securities" within the meaning of the Securities Exchange Act of 1934. The Supreme Court analyzed Congressional intent in creating the applicable law noting that, although Congress did not intend to provide "a comprehensive federal remedy for all fraud", it considered the term 'security' to be "sufficiently broad to encompass virtually any instrument that might be sold as an investment." <u>Id</u>., at 61, 949. This was in line with Congress' purpose in enacting the securities laws to regulate investments "in whatever form they are made and by whatever name they are called." <u>Id</u>.

The <u>Reves</u> Court opined that the term "'note' may now be viewed as a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context", but that not all notes could be labeled "securities" within the purview of the Securities Exchange Act. <u>Id</u>., at 62, 950. It then specifically rejected the application of <u>Howey</u> to notes, finding said case involved the "determination of whether an instrument was an 'investment contract.'" <u>Id</u>., at 64, 951. The <u>Reves</u> Court then held that, in determining whether an instrument denominated a "note" is a "security," courts are to apply the version of the "family resemblance" test. <u>Id</u>., at 67, 952. For these reasons, the Court agrees with Plaintiff that <u>Howey</u> is inapposite to the facts of this case and the <u>Reves'</u> test governs.

As held in <u>Reves</u>, a note is presumed to be a "security" and that presumption may be rebutted only by showing that it falls into one of the judicially enumerated instruments

that are not securities or if the note bears a strong resemblance to any of the items that are on that list. [9] Id.  In other words, the presumption can be rebutted by demonstrating it is on the list or by comparing it to the listed items and showing that it was issued for the purpose of enabling commerce, rather than investment.  Lerner v. Colman, 485 F.Supp.3d 319 (D. Mass. 2020).  The test is whether such instruments bear a "family resemblance" to non-securities, relying on the following four (4) factors: 1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction, i.e. whether it was issued to generate profit rather than finance commercial operations; 2) whether the "plan of distribution" indicates it is intended for speculation or investment; 3) whether a reasonable investor would consider it a security; and 4) whether another regulatory scheme significantly governs the transaction, making application of the Securities Act unnecessary.  Reves, 494 U.S. at 67, 110 S. Ct. at 951-52; Lerner, 485 F.Supp.3d at 335.

At the outset, the Court must mention that the Paulson Defendants failed to rebut the presumption that the Note in question, ironically labeled a "Convertible Promissory Note" by them, is a security, as required in Reves.  They have failed to show that the Note fits into any of the existing categories of items that have been found not to be securities or bears a strong resemblance to any of them, opting instead to focus their argument on the inapplicable Howey test.  This alone merits dismissing their argument as to this element.  See Leemon v. Burns, 175 F.Supp.2d 551, 559 (S.D.N.Y. 2001).

---

[9] The types of notes that have been found to fall outside the definition of a security include "the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)").  Reves, 494 U.S. at 65, 110 S. Ct. at 951.

After reviewing the Note in question, the Court finds it is not an item on the list and applying the four-part <u>Reves'</u> test as explained below, demonstrates that the Note also bears no resemblance to any item already on it and must therefore be considered a security.[10]

As to the first factor, the motivations that would prompt a reasonable buyer and seller to enter into the transaction, <u>Reves</u> indicates:

> [I]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."
>
> <u>Reves</u>, 494 U.S. at 66, 110 S. Ct. at 951-52.

It is undeniable that the Note in this case meets the first element to be considered a security. In exchange for giving the Paulson Defendants close to $17,000,000.00, Plaintiff would get a fifty percent (50%) membership interest in V12, as well as profits and ultimately a fifty percent (50%) interest in F40. In other words, taking the Amended Complaint at face value, it seems that Plaintiff's primary purpose was to invest and generate a profit. The Amended Complaint also indicates that throughout this time, Plaintiff was named to the top managerial position in F40 and doubled its profits in one (1) year, further evidencing his long interest in making his initial $17,000,000.00 investment prosper. Indeed, it is hard to conceive that seasoned businessmen such as

---

[10] The <u>Reves'</u> elements are to be considered as a whole, and failure to meet one of them is not determinative. <u>McNabb v. S.E.C.</u>, 298 F.3d 1126, 1132-33 (9th Cir. 2002).

Plaintiff and co-Defendant Paulson regarded this transaction as anything but an investment.

The Paulson Defendants' argument that, because the investment was wired to co-Defendant PRV rather than F40 should somehow change this conclusion, is a non-starter. As holder of all F40's and V12's ownership interest, it is entirely plausible that the funds would be wired to PRV to finance its luxury automobile business and not directly to F40. Simply put at this juncture, the allegations point to the conclusion that Plaintiff's desire was to earn a substantial profit, and later, an equity interest, rather than any of the more traditional elements that have been held not to be a security.  See Sánchez-Cardona v. Corp. Planners, Inc., 895 F.Supp. 26, 29 (D.P.R. 1995) ("[A] security is defined not by its form or nomenclature, but by its substance; the economic reality of the transaction is the hinge on which the analysis turns").  Thus, the first Reves' factor favors finding that the Note is a security.

The Paulson Defendants' case gains more traction in the second element, the plan of distribution of the instrument.  Reves instructs that the Court must see if it is an instrument in which there is "common trading for speculation or investment."  Reves, 494 U.S. at 66, 110 S.Ct. at 952.  They argue that the Note evidences a transaction directed at just one person, Plaintiff, unlike traditional securities that are offered to a broad section of the public.  However, as candidly argued by Plaintiff and his cited caselaw, some courts have found that "[a] debt instrument may be distributed to, but one investor yet be a 'security.'"  See Leemon, 175 F. Supp.2d at 560 n.14 (collecting cases and finding that a debt instrument may be distributed to one investor and still qualify as a security because "[a]ny other interpretation of Reves would contradict the Supreme Court's determination

that in the federal securities laws Congress 'enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment.'") (quoting National Bank of Yugoslavia v. Drexel Burnham Lambert, Inc., 768 F.Supp. 1010, 1015-16 (S.D.N.Y. 1991)); see also Stoiber v. S.E.C., 161 F.3d 745, 752 (D.C. Cir. 1998) (thirteen customers may constitute "common trading"); Trust Co. of Louisiana v. NNP Inc., 104 F.3d 1478, 1489 (5th Cir. 1997) (individually negotiated convertible note was a security). Thus, this factor could favor either party.

The third element is the reasonable expectations of the investing public vis-a-vis the item. The Paulson Defendants contend that this element tilts in their favor because there were only two (2) participants and no investing public. If this argument were to hold true, then no court would have ever held that an instrument that only has one (1) investor may fall under the securities laws, as previously cited. See Leemon, 175 F.Supp.2d at 559 ("That there is no indication that any public distribution of the Note was intended does not take the transaction in this case outside the protection of the federal securities laws."). Reves indicates that what is important is that "[t]he Court will consider instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction" and that fundamental essence of a "security" is its character as an investment. Reves, 494 U.S. at 66, 110 S. Ct. at 952.

Having found that other courts have considered a single investor business venture to qualify as a security and that the Amended Complaint contains sufficient facts

supporting the assertion that the Note is an investment, the Court finds that the third element favors the Note being labeled a security.

The Paulson Defendants fail to discuss the final prong, relying instead on the strength of their analysis of the other three (3) elements. Therefore, they have waived this argument, which in any event, favors Plaintiff's position as well.

The fourth element of the Reves' test requires the Court to look at "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." Reves, 494 U.S. at 67, 110 S. Ct. at 952. The Reves' Court found that, because there was no risk-reducing factor in the notes before them, that suggested those notes were securities. In doing so, the court distinguished some of the cases that found the instruments were not notes, for instance, where the certificates of deposit were FDIC-insured and all the protection that entailed,[11] as well a pension plan regulated under ERISA.[12] Clearly, both situations involved investments that contained adequate protection for the investor.

In contrast, the Note in the present case was uncollateralized and uninsured, offering absolutely no protection to Plaintiff, who bore the sole risk of his investment. Consequently, this final factor favors finding that the Note is a security.

Finally, the language of the draft Note prepared by and sent by the Paulson Defendants themselves indicates that the Note "may not be transferred in violation of any restrictive legend set forth hereon or in violation of any federal or state securities laws."

---

[11] Marine Bank v. Weaver, 455 U.S. 551, 557-58, 102 S.Ct. 1220, 1222-23 (1982).
[12] Teamsters v. Daniel, 439 U.S. 551, 569-70, 99 S.Ct. 790, 801-02 (1979).

This assertion lends further credence to Plaintiff's position that the Note was always considered a security.  (Docket No. 28, Exhibit A, § 9).

For the above reasons, the Court finds that the Note in the present case is properly considered a "note" that falls within the federal securities laws.

### 4. Economic loss and loss causation.

Finally, "[t]o survive a Rule 12(b)(6) motion as to loss causation, a plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." Biogen, Inc., 84 F.4th at 19.

The Paulson Defendants aver that Plaintiff failed to demonstrate that he has suffered an economic loss, or that they caused it.  They proffer that Plaintiff speculates that he will suffer future harm if he does not receive his share of future profits or his equity in F40 if he ever qualifies to be admitted as an owner.  Thus, he fails to meet the loss and loss causation element.

Plaintiff's position is that the Amended Complaint plainly alleges that he has not been paid his share of the F40 profits owed to him for the year 2022, pursuant to the terms of the original bargain.  Specifically, he states that the right to share in the investment profits *prior* to being admitted as a member is contained at ¶18 of the Amended Complaint and the fact that there were profits, which doubled in one (1) year, at ¶22.  These profits were never paid, which demonstrates a reduction in Plaintiff's investment because of the Paulson Defendants' actions and misrepresentations.  He posits that this loss is not speculative, but rather has already occurred.

A reading of the Amended Complaint shows that it clearly states that profits were to be received prior to the F40 membership and that these profits were never paid.  In

fact, the Amended Complaint states that Plaintiff has received nothing in return for his investment almost two (2) years after payment was tendered.  As such, it is hard to fathom the Paulson Defendants' claim that no loss occurred and that they did not cause it.

Finally, to the extent that the Paulson Defendants argue that Plaintiff's damages were self-inflicted - "he inflicted any such harm upon himself by rejecting and attempting to renegotiate every draft of the Convertible Note that the Paulson Defendants delivered to him"[13]  - the Court finds that this argument is inappropriate at this stage, where the Court must accept as true the allegations contained in the pleadings.  Whether that defense will prosper is a matter to be addressed moving forward, either at the summary judgment stage or before a jury during the trial.

### B.  Puerto Rico Securities Fraud.

The PRUSA was enacted by the Puerto Rico Legislature to protect investors in the securities business.  <u>Paine Webber, Inc. v. First Boston, Inc.</u>, 136 D.P.R. 541, 543 (1994).  Section 890 is the local counterpart of the federal securities rule 10b-5, insofar as it prohibits the sale of "a security by means of a false statement of a material fact or omitting to state a material fact."  P.R. Laws Ann. tit. 10, § 890.

The Paulson Defendants' position is that this claim must be dismissed for the same reason as the federal securities claim, to wit, failure to plead a material misrepresentation, scienter, loss, or loss causation and because the Note is not a security.  They additionally proffer that in the case of <u>Olivella Zalduondo v. Triple-S, Inc.</u>, 187 D.P.R. 625, 646-48 (2013), the Puerto Rico Supreme Court limited dealings under this section to transactions

---

[13] Docket No. 28, at p. 14.

between entities engaged in the securities business.  They proffer that this claim must fail because the parties herein are engaged in the automotive industry and not the securities business.

The first argument is a non-starter, insofar as the Court has already held that Plaintiff has adequately pled all the elements as part of its federal securities claim.  As to the second argument, the Court agrees with the Paulson Defendants and finds it to be dispositive of this claim.

In Plaintiff's Opposition, he attempts to distinguish Olivella Zalduondo's holding, arguing that the Puerto Rico Supreme Court made an important distinction when it indicated that the case did not involve the purchase of securities "where there was fraud or deceit" and that the Paulson Defendants' reading goes against the plain reading of the statute because it refers simply to a "person" as the seller of the security.  Plaintiff's reading of this passage, however, is tied to the case's final holding that the law was inapplicable to those particular facts.  The Puerto Rico Supreme Court found the law had a narrow focus, which was to "prevent fraud, protect investors, regulate the securities market and the persons and entities that are dedicated to this" and thus found that the sale of stocks in that case contained no fraud allegations.  Olivella Zalduondo, 187 D.P.R. at 648.  The Puerto Rico Supreme Court found that PRUSA was inapplicable precisely because there was no fraud alleged, one of the main objects of securities laws, and because the transaction involved the sale of stock by a company that did not engage in that type of business.  The Puerto Rico Supreme Court did not hold, as Plaintiff would apparently have this Court find, that any purchase of an instrument involving fraud and deceit will fall under the PRUSA.

The Court agrees with the Paulson Defendants that Olivella Zalduondo was very clear in holding that it was a controversy between a shareholder "and a company not dedicated to the sale of securities", and for this reason, fell outside the scope of the PRUSA See Id., at 646 (finding that the PRUSA applies "to a transaction that includes investors or at least entities whose principal activity is the securities business."). This was in line with the Puerto Rico Supreme Court's holding in PaineWebber, 136 D.P.R. at 544, where it discussed the history of the PRUSA, and stated that the law was created "to protect investors and the general public in requiring those dedicated to the securities business to meet certain criteria." See also, Unión Independiente Auténtica de Empleados de la Autoridad de Acueductos y Arcantarillados v. FirstBank de Puerto Rico, No. KLAN202000925, 2022 WL 3210642 at *6 (P.R. Cir. June 17, 2022) (finding that to determine whether the PRUSA applied, the issue had to involve a securities transaction carried out by entities dedicated to that business.).

Plaintiff's additional reliance on Méndez Moll v. Axa Equitable Life Ins. Co., 202 D.P.R. 630 (2019) is also misplaced. Méndez Moll called on the Puerto Rico Supreme Court to determine whether a variable annuity was a covered security under the PRUSA and the kinds of remedies available to a claimant under said law. The Puerto Rico Supreme Court specifically quoted the legislative history of the law, finding the "clear legislative purpose is to prevent persons dedicated to the securities business from incurring in deceitful and fraudulent practices." Id., at 636. It seems clear, then, that the law in Puerto Rico was always geared to persons involved in the securities business and not a company dedicated to insurance as in Olivella Zalduondo, or as here, to an automotive business.

In view of the above, Plaintiff's arguments as to the PRUSA are unavailing, and this claim is DISMISSED WITH PREJUDICE.

### C. Breach of Contract.

Under Puerto Rico law, a breach of contract claim has three elements, to wit, (1) a valid contract, (2) a breach by one of the parties, and (3) damages due to that breach. Carrero v. Molina Healthcare of Puerto Rico, Inc., No. 21-1605 (RAM), 2023 WL 6201408, at *2 (D.P.R. Sept. 22, 2023); Yacht Caribe Corp. v. Carver Yacht LLC, 270 F.Supp.3d 547, 555 (D.P.R. 2017) (citations omitted).  It has long been held that obligations arising from contracts are law between the contracting parties, their successors, and third persons, and one who fails to comply with a contract's essential obligations is in breach of that contract.  P.R. Laws Ann. tit. 31, § 9754 (2020).

The Paulson Defendants anchor this defense on a specific allegation raised in the Amended Complaint and which forms the basis of this case, namely, that they failed to deliver the Note.  According to them, the Amended Complaint itself repeatedly rejects this, as it indicates in several places, they delivered the Note.  Their defense is that Plaintiff refused the drafts they sent, wanting to change the Note's terms.  They additionally proffer that, since there was no deadline to deliver the Note, they cannot be found to be in breach of the agreement and thus, Plaintiff has suffered no harm as it is a future, "speculative" harm.

Plaintiff urges the Court to reject the Paulson Defendants' invitation to find that "an unsigned and difficult to decipher draft note, which did not reflect the agreed terms of the investment, constitutes performance under the contract." (Docket No. 59, at p. 22). He additionally argues such an interpretation of these facts is absurd, where Plaintiff

delivered $17,000,000.00 and was never provided the instrument evidencing that investment or paid any profits therefrom.

There is no controversy as to the first element, that there was a valid contract between the parties. As to the second element, the Court finds that the allegations support a breach thereof by the Paulson Defendants, for the same reasons already discussed in this Opinion and Order. The Amended Complaint alleges that the Note was never delivered in final form over nineteen (19) months after the money was paid, and further, that the drafts that were delivered were non-compliant with the original terms of the agreement in several ways. This clearly constitutes a breach from the original agreed-upon terms.

As to the damages, the Court finds they are not speculative. The terms of the original agreement stated that Plaintiff was to be paid a profit for his service to F40 before the membership interest in the company materialized. This was never paid to Plaintiff, although he worked as CEO of F40 for over a year and a half after he wired the initial investment to Defendants.

These allegations are sufficient at this juncture to deny the Paulson Defendants' request to dismiss the breach of contract claim. Thus, the Motion to Dismiss the breach of contract claim is DENIED.

### D. "Dolo"/Fraud/Bad Faith.

Plaintiff brings forth a "dolo"/fraud claim, and separately, a damages claim based on Defendants' bad faith. The Court discusses these claims together because they are intertwined.

Although the Puerto Rico Civil Code was amended in 2020, the new code incorporated the former Code's "dolo" figure in several places, mainly in Articles 292, 1174 and 1272 and remains practically unchanged.  See P.R. Laws Ann. tit 31, §§ 6211, 9316 and 9882 (2020).  For this reason, the Puerto Rico Supreme Court's caselaw analyzing "dolo" and its requirements under the old Code is still good law.

The new Civil Code defines "dolo" as bad faith and the deliberate failure to comply with an obligation.  P.R. Laws Ann. tit 31, § 9316 (2020).  The Puerto Rico Supreme Court has recognized that contractual "dolo" is a broad term that includes deceit, fraud, misrepresentation, undue influence, and other insidious machinations, and that "dolo" in the performance of obligations "is equalized to bad faith."  P.R. Tel. Co. v. SprintCom, Inc., 662 F.3d 74, 99 (1st Cir. 2011); Canales v. Pan Am., 112 D.P.R. 329 (1982); Márquez v. Torres Campos, 111 D.P.R. 854 (1982) ("["dolo" in the formation of a contract] includes deceit, fraud, misrepresentation, undue influence, etc.").  Thus, fraudulent conduct and bad faith are included in the broader definition of the term "dolo."

"Dolo" can take two forms: (1) in the formation of the contract, and (2) during the performance of the contract.  See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico v. U.S. Bank Nat'l Ass'n, No. 17 BK 3283-LTS, 2023 WL 8244056, at *23 (D.P.R. Nov. 28, 2023); Portugués-Santana v. Rekomdiv Int'l, 657 F.3d 56, 59-60 (1st Cir. 2011).

"Dolo" in the formation of a contract is essentially fraud in the inducement of the contract, which exists when a party is induced by another to execute a contract or enter a business which he would otherwise not have done.  P.R. Laws Ann. tit. 31, §§ 6211 (2020). The party alleging this must demonstrate: "(1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff

as a result of the reliance; and (4) an intent to defraud."  <u>P.R. Electric Power Auth. v. Action Refund</u>, 515 F.3d 57, 66 (1st Cir. 2008).

On the other hand, "dolo" in the performance of a contractual obligation occurs "where a party, knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation."  <u>Casco, Inc. v. John Deere Constr. & Forestry Co.</u>, No. 13-1325 (PAD), 2015 WL 4132278, at *2 (D.P.R. July 8, 2015); <u>Colón v. Promo Motor Imports, Inc.</u>, 144 D.P.R. 659, 668 (1997); <u>Canales v. Pan American</u>, 112 D.P.R. 329, 340 (1982).   It is a breach of contract coupled with bad faith.

The Civil Code establishes that the party who engages in "dolo" is liable for all damages which arise from the nonfulfillment of the obligation, a result which also remains unchanged from the 1930 Code.  P.R. Laws Ann. tit. 31, §§ 6192, 6213, 9883. <u>Puerto Rico Tel. Co., Inc. v. SprintCom, Inc.</u>, 662 F.3d 74, 99 (1st Cir. 2011); <u>Ramos v. Orientalist Rattan Furnt., Inc.</u>, 130 D.P.R. 712 (1992); <u>Colón v. Blades</u>, 717 F.Supp.2d 175, 185 (D.P.R. 2010) ("[W]hen a party acts with bad faith ("dolo") in breaching a contract, the aggrieved party may recover all damages that originate from the nonfulfillment of the obligation.").

The Paulson Defendants base their argument on both types of "dolo."  At the contracting stage, they anchor their argument on the first and last elements, that Plaintiff failed to allege a claim for false representation and has failed to plead harm.  As to the performance of the contract, they aver there was no false representation and since Plaintiff cannot establish a breach of contract claim, this modality of "dolo" likewise cannot lie.

On the other hand, Plaintiff proffers he has pled both "dolo" in the contact formation as well as during its execution.   He contends that he has amply pled misrepresentation of the terms of the agreement and, had the Paulson Defendants not been deceitful from the outset, they would have delivered the Note and the agreed upon payments throughout the life of the breached contract, nineteen (19) months prior to the filing of the present case.

 In terms of contractual formation "dolo", the Court has already found that the Amended Complaint has adequately pled misrepresentation as well as harm, so this argument does not get the Paulson Defendants very far. As to the other two (2) elements, reasonable and foreseeable reliance, and intent to defraud, the Court likewise finds they have been adequately pled at this stage.   Plaintiff relied on the Paulson Defendants' promises about both the terms of the initial agreement as well as promises that the final Note was "forthcoming", though it was never delivered.   Throughout the nineteen (19) months in between, Plaintiff adequately pled he was not paid his benefit of the bargain, having been stiffed by Defendants from the F40 profits he was to receive in 2022 pursuant the terms of the bargain.   At this, stage, and based on the allegations of the Amended Complaint, Plaintiff has made a plausible claim for intent to defraud as well.

The argument regarding "dolo" throughout the duration of the contact does not fare any better insofar as the Court has already found that there was a misrepresentation as well as a colorable breach of a contract claim.

For these reasons, the Court finds Plaintiff has adequately pled "Dolo"/fraud and bad faith.

### E.  Unjust Enrichment and Constructive Trust.

Finally, the Paulson Defendants assert that the unjust enrichment claims must be dismissed, insofar as the investment in question was made pursuant to an agreement.  As to the constructive trust, they proffer that under Puerto Rico law, it is to be used exclusively as a remedy to prevent unjust enrichment.   Since the claim for unjust enrichment fails, so too must the constructive trust claim.

Plaintiff claims in opposition that under the federal rules, these two (2) items are not mutually exclusive, and a plaintiff may pursue damages for both breach of contract and unjust enrichment at the pleading stage.   As to the constructive trust, citing to the 1930 Civil Code and to the case of <u>Puerto Rico Tourism Co v. Priceline, Inc., et al</u>, No. 14-1318 (JAF), 2015 WL 5098488 (D.P.R. Aug, 31. 2015), he argues that Puerto Rico law allows for a constructive trust "under the right circumstances" and is therefore not limited to unjust enrichment.  On this basis, Plaintiff moves the Court not to dismiss these two (2) claims.

The Court, sitting in a diversity action, looks at Puerto Rico substantive law for the answer to these questions.  <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64, 58 S. Ct. 817 (1938).  The 1930 Civil Code stated that unjust enrichment applied "when there is no statute applicable to the case at issue, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established usages and customs, shall be taken into consideration."  10 P.R. Laws Ann. tit. 31, § 7 (repealed); <u>see also</u> P.R. Laws Ann. tit. 31, § 8984 (2020) ("Sources of obligations are: law; contracts; quasi contracts; illicit acts; acts or omissions where fault

or negligence occurs; any other act apt to produce them, according to principles of jurisprudence.").

After the new Civil Code came into effect in 2020, this catch-all provision was left out, but is now codified throughout three (3) different articles, to wit, Articles 2, 5 and 6. P.R. Laws Ann. tit. 31, §§ 5312, 5315, 5316 (2020). Article 2 discusses sources of the law; Article 5 mentions general legal principles and Article 6 addresses the court's duty to resolve issues before it. Id. Article 5 specifically states that "the general legal principles will apply in the absence of a law or custom, notwithstanding their role in informing the legal system." Id., at §5315. Commentators to the new Civil Code have stated that the "general legal principles" mentioned in Article 5 refer to a set of ideas not covered in a law or a custom, which suggests the formerly labeled term of "equity" will now apply as well. See Miguel R. Garay, Código Civil 2020 y su Historial Legislativo, 21 (2020). Other commentators to the new Civil Code noted that this article no longer specifically mentions equity, but it will always be applicable. ("Sin incluir en esa enumeración la equidad, que creemos estará tan vigente como siempre."). Luis Muñiz Arguelles, et al., El Código Civil de Puerto Rico de 2020: Primeras Impresiones, 12 (2021). Under the new Civil Code, equity is still applicable, and an unjust enrichment claim may be properly alleged.

According to the Puerto Rico Supreme Court, a claim for unjust enrichment consists of five (5) elements: "(1) existence of enrichment; (2) a correlative loss; (3) nexus between loss and enrichment; (4) lack of cause for enrichment; and (5) absence of a legal precept excluding application of enrichment without cause." Montalvo v. LT's Benjamin Records, Inc., 56 F.Supp.3d 121, 136 (D.P.R. 2014) (quoting Hatton v. Municipality of Ponce, 134 D.P.R. 1001 (1994)). The case of Corporación Insular de Seguros v. Reyes-

Muñoz, 849 F.Supp. 126, 135 (D.P.R. 1994) held that a constructive trust is the appropriate remedy for an unjust enrichment claim.

However, it has been well established that the doctrine is not applicable where a contract governs the dispute at issue and is only available as a last resort and when there is no statute or remedy directly applicable to the situation. P.R. Tel. Co. v. Sprintcom, Inc., 662 F.3d 74, 97 (1st Cir. 2011); In re Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Commonwealth of Puerto Rico, 578 F.Supp.3d 267, 296 (D.P.R. 2021) (unjust enrichment can be used "when the laws have not foreseen a situation where a patrimonial shift occurs, which . . . cannot be rationally explained by the prevalent body of laws" and is inappropriate when other claims have been alleged) (quoting Ortiz Andújar v. E.L.A., 122 D.P.R. 817, 822 (1988)); Rivera-Muñiz v. Horizon Lines Inc., 737 F.Supp.2d 57, 65 (D.P.R. 2010) (unjust enrichment is "subsidiary to other remedies provided by law and is unavailable if the plaintiff may seek other forms of relief"); Ocaso, S.A., Compañía de Seguros y Reaseguros v. P.R. Mar. Shipping Auth., 915 F.Supp. 1244, n.15 (D.P.R. 1996). In fact, the norm is to deny its applicability when there is an existing contract between the parties. See Westernbank Puerto Rico v. Kachkar, No. 07-1606 (ADC), 2009 WL 6337949 at *29 (D.P.R. Dec. 10, 2009); and Medina & Medina v. Country Pride Food Ltd., 631 F.Supp. 293, 302 (D.P.R. 1986).

In line with Puerto Rico Supreme Court's precedent, as Plaintiff has brought forth a multitude of other claims, including breach of contract, "dolo" and securities fraud under federal and Puerto Rico law, he clearly has other legal remedies available. Thus, the Court finds Plaintiff's unjust enrichment claim cannot lie and the Paulson Defendants' request to dismiss this claim is GRANTED.

As to the constructive trust, it is directly tied to the unjust enrichment claim and consequently, the Court likewise finds that it is unavailing to Plaintiff.  Plaintiff avers that the Priceline case and P.R. Laws Ann. tit. 31, § 7 (1930) (repealed) allow for a constructive trust to be created under the circumstances of this case.  Plaintiff points to no other case or example that would allow the Court to permit the creation of a constructive trust absent an unjust enrichment claim.  The Priceline case is distinguishable because it simply mentioned the possibility of the establishment of such a trust and did not analyze the merits of the claim before it.  In any event, it analyzed the case under provisions of the 1930 Civil Code that have now been repealed.

Plaintiff argues that such a trust can be established when there are "ill-gotten gains" and "fraud, theft or other means"[14] but he cites to no other caselaw or statute to guide the Court in this endeavor. If the creation of a constructive trust would be as commonplace as Plaintiff proffers, it would routinely be used in the multiplicity of theft and fraud cases this Court entertains daily, which is not the case.

Consequently, the Paulson Defendants' request to dismiss the constructive trust claim is GRANTED.

## CONCLUSION

For the foregoing reasons, Co-Defendant John Paulson and PRV Holdings, LLC's "Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint and Stay All Proceedings" is GRANTED IN PART and DENIED IN PART  (Docket No. 28) as follows:  the request to dismiss the federal securities fraud, "dolo"/fraud/bad faith, and

---

[14] Docket No. 59, p. 24.

breach of contract claims is DENIED and the request to dismiss the Puerto Rico securities fraud, unjust enrichment claim and the constructive trust is GRANTED and these causes of action are DISMISSED WITH PREJUDICE.

Finally, this case will remain stayed considering that the Motion to Dismiss the Amended Complaint and Stay all Proceedings filed by J.P. Morgan (Docket No. 77) is not ripe for adjudication.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 5th day of February 2024.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES DISTRICT JUDGE